ATTORNEYS FOR APPELLEE
David W. Stone IV
Stone Law Office
Anderson, Indiana

Richard S. Eynon
David M. Brinley
Eynon Law Group, P.C.
Columbus, Indiana

Richard L. Denney
Lydia Joann Barrett
Denney & Barrett
Norman, Oklahoma

ATTORNEYS FOR APPELLANT
TRW VEHICLE SAFETY SYSTEMS, INC.
Mary K. Reeder
Riley, Bennett & Egloff, LLP
Indianapolis, Indiana

Damond R. Mace
Andrew R. Kruppa
Squire, Sanders & Dempsey L.L.P.
Cleveland, Ohio

ATTORNEYS FOR APPELLANT
FORD MOTOR COMPANY
Nelson D. Alexander
Eric A. Riegner
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS ASS'N
Thomas C. Doehrman
Doehrman-Chamberlain
Indianapolis, Indiana



FILED
Oct 13 2010, 3:06 pm
CLERK
of the supreme court,
court of appeals and
tax court

---

# In the
# Indiana Supreme Court

No. 73S05-0909-CV-404

TRW VEHICLE SAFETY SYSTEMS, INC., AND
FORD MOTOR COMPANY,                                         *Appellants (Defendants below),*

v.

SALLY J. MOORE, PERSONAL REPRESENTATIVE OF
    THE ESTATE OF DANIEL A. MOORE, DECEASED,        *Appellee (Plaintiff below).*

Appeal from the Shelby Circuit Court, No. 73C01-0305-CT-13
The Honorable Charles D. O'Connor, Judge

On Transfer from the Indiana Court of Appeals, No. 73A05-0710-CV-552

**October 13, 2010**

**Dickson, Justice.**

Daniel Moore died when, despite wearing his seatbelt, he was ejected through the sunroof of his Ford Explorer vehicle during a rollover that followed a tire failure as he was driving on

Interstate 65 near Edinburgh, Indiana. He was survived by his wife and one minor son. His widow, as personal representative of his estate, brought this wrongful death action. At the conclusion of a fourteen-day trial, the jury found the total damages to be $25,000,000 and allocated fault as follows: decedent Daniel Moore, 33%; defendant Ford Motor Company ("Ford"), 31%; nonparty Goodyear Tire and Rubber Company ("Goodyear"), 31%;[1] and defendant TRW Vehicle Safety Systems, Inc. ("TRW"), 5%. Judgments were entered against Ford in the sum of $7,750,000 and against TRW in the sum of $1,250,000. Appeals were commenced by both defendants, and the plaintiff cross-appealed. Finding the evidence insufficient to support the jury's verdicts against Ford and TRW, the Court of Appeals reversed as to both defendants. Ford Motor Co. v. Moore, 905 N.E.2d 418 (Ind. Ct. App. 2009). We granted transfer and now reverse the judgment as to TRW, reverse the allocation of fault to nonparty Goodyear, reverse the determination of total damages, and remand for retrial to (a) allocate 100% of the fault between the plaintiff and Ford, and (b) redetermine the total damages subject to fault allocation unless the plaintiff accepts remittitur as hereinafter specified.

In its appeal from the jury verdict and adverse judgment, Ford lists the following issues: (a) sufficiency of the evidence on the design defect claim; (b) the effect of a denial of a motion for directed verdict upon the rule favoring affirmance of a general verdict supported by any evidence; (c) the prohibition of medical causation testimony; and (d) the failure to grant a mistrial following an in-court demonstration by the plaintiff. TRW's appeal focuses on: (a) denial of its motion for judgment on the evidence; (b) exclusion of evidence; and (c) damages in excess of the plaintiff's demand, insufficiently supported, and resulting from improper closing argument. Ford's appellant's brief also "adopts and incorporates" without further argument substantially all of TRW's appellate arguments. The plaintiff's cross-appeal claims there was insufficient evidence to support the jury's apportionment of 31% fault to nonparty Goodyear.

### 1. Ford's Insufficient Evidence Claims

Ford seeks reversal and judgment in its favor on grounds of insufficient evidence. It as-

---

[1] Goodyear settled its dispute with the plaintiff prior to trial but remained in the case as a nonparty defendant.

serts that the plaintiff's case against it was based on three theories of liability: (a) defective seat-belt system; (b) defective sunroof; and (c) defective design regarding the Ford Explorer's handling and stability characteristics. Ford argues that the evidence fails to prove at least one element of each of these theories. In response, the plaintiff argues that the evidence was sufficient to support the claims alleging defects as to the seatbelt and the sunroof.

In the appellate review of a claim of insufficient evidence in a civil case, we "affirm a verdict when, considering the probative evidence and reasonable inferences, a reasonable jury could have arrived at the same determination." Gary Cmty. Sch. Corp. v. Powell, 906 N.E.2d 823, 830 (Ind. 2009). We neither weigh the evidence nor judge witness credibility but consider only the evidence and inferences most favorable to the judgment. Martin v. Roberts, 464 N.E.2d 896, 904 (Ind. 1984); Beall v. Mooring Tax Asset Group, 813 N.E.2d 778, 781 (Ind. Ct. App. 2004), *trans. not sought*. We will reverse only "if there is a lack of evidence or evidence from which a reasonable inference can be drawn on an essential element of the plaintiff's claim." Martin, 464 N.E.2d at 904.

As to the plaintiff's claim of negligent seatbelt system design, the parties agree that the plaintiff's decedent was ejected through the sunroof in the rollover when his seatbelt developed slack. Competing expert witnesses disputed the cause of the slack. Ford contends that the evidence was insufficient because it failed to establish the requisite standard of care and failed to prove that Ford's conduct fell below such standard. Ford argues that because automotive design is outside a layman's common experience, the plaintiff was required, and failed, to present competent expert testimony establishing the particular standard of care and the breach of such standard. Ford urges that the plaintiff should have presented evidence "concerning the methodology a reasonable manufacturer would employ when designing a seat belt system or selecting its component parts." Ford's Appellant's Br. at 29. Ford also adopts and incorporates TRW's arguments alleging insufficient evidence. To the extent that TRW's arguments extend to Ford, they are that the plaintiff failed to present evidence of the proper standard of care; to offer testing, data, studies, or other evidence to show a safer, more practicable product design; and to rebut evidence that its proposed alternative design itself presented safety concerns.

3

The Indiana Product Liability Act generally imposes strict liability for physical harm caused by a product in an unreasonably dangerous defective condition. Ind. Code § 34-20-2-1. For actions based on an alleged product design defect, however, the Act departs from strict liability and specifies a different standard of proof: "[T]he party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." Ind. Code § 34-20-2-2. Thus the statute itself prescribes the applicable standard of care. We decline to require proof of any additional or more particular standard of care in product liability actions alleging a design defect.[2]

Pointing to the testimony of Steven Meyer, a widely published mechanical engineer who has studied restraint systems in rollover accidents and testified for the plaintiff, Ford asserts that Meyer failed to provide any direct testimony that Ford's designers fell below the standard of care. This deficiency, Ford argues, establishes its claim of insufficient evidence as to the plaintiff's claim of defective design of the seatbelt system.

While the plaintiff was required to prove such breach of duty, the sufficiency of such proof is determined from the evidence itself and did not require an opinion witness's declaration thereof. Meyer testified that the 1997 Explorer's seatbelt system was defective because it "allows the belt to become unlocked during the rollover portion of a rollover." Tr. at 579. He explained that this could have been avoided if Ford had chosen an alternative retractor design, a "pretensioner," that Ford had used in other passenger vehicles, particularly in Europe. Tr. at 594–96. Acknowledging that Meyer testified that a different design was available and should have been chosen, Ford attacks Meyer's credibility and lack of personal experience in designing automotive components, and it argues in response that the availability of a safer alternative design should not suffice to prove negligence.

---

[2] The American Law Institute recommends a different approach, prescribing specific subelements of a claim for strict product liability based on design defect. It views a product as "defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability § 2(b) (1997). Our legislature did not adopt this analytical framework but instead enacted in 1998 a negligence standard for product liability claims based on defective design. *See* Ind. Code § 34-20-2-2.

As directed by statute, the plaintiff was required to "establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." Ind. Code § 34-20-2-2. That Ford elected to equip its 1997 Ford Explorer with a seatbelt system without utilizing the pretensioner technology it used for Ford vehicles manufactured in Europe constitutes probative evidence as to the issue of Ford's use of reasonable care. For the purpose of appellate review for sufficiency, such evidence may support a reasonable inference of seatbelt system design negligence.

With respect to the claim of negligent sunroof design, Ford claims an absence of evidence that the sunroof was dislodged by "occupant forces pushing outward" rather than as a result of the "vehicle slamming into the ground during the first roll" before the ejection occurred. Ford's Appellant's Br. at 34. Ford also argues that, even if the sunroof was dislodged by occupant force, there was no evidence that this resulted from a structural failure.

Ford acknowledges that the plaintiff's decedent was ejected from the Explorer through the sunroof. Ford's Appellant's Br. at 7. According to the opinion testimony of Joseph L. Burton, M.D., had the decedent been retained inside the vehicle, "he should have survived this accident." Tr. at 714–15. Testimony from Stephen A. Batzer, Ph.D., P.E., provided evidence that the rollover tendency of Ford Explorers and other sport utility vehicles was well-known before the 1997 Explorer was built, that the sunroof glass detached in the course of this rollover accident and provided an opening in the roof when its brackets failed, and that the use of a stronger sunroof bracket design was technologically and economically feasible. Whether the roof opening occurred because the glass sunroof became detached as a result of the physical forces on the vehicle as it rolled or was due to occupant force from the inside is not determinative. There existed evidence showing that the decedent was ejected through the sunroof opening created when the sunroof glass dislodged because of the failure of its mounting brackets.

While Ford vigorously contends that its design decisions were reasonable, we do not weigh the evidence or judge witness credibility in reviewing for sufficiency. Martin, 464 N.E.2d at 904. As to the negligent design of the seatbelt system and the sunroof, there is not a complete absence of evidence or reasonable inferences favoring the jury's verdict, and we must defer to the

5

jury. *Id.* Considering the probative evidence and reasonable inferences, we do not find that the jury was unreasonable in its determination of partial fault on the part of Ford and thus affirm the verdict as to these claims.

Ford also asserts that the evidence was insufficient to prove design defects affecting the handling and stability characteristics of the Explorer. This claim, however, was not before the jury in its final deliberations. During the trial court's preliminary instructions at the commencement of trial, the jury was told that the plaintiff "claims that the Ford Explorer contained handling and stability defects that caused it to lose control and roll over in reasonably foreseeable driving events, such as tire failures." Tr. at 67–68. At the conclusion of all the evidence, Ford filed briefs "in support of directed verdict" as to the sunroof claim and the handling and stability claim. Appellants' App'x at 33, 68, 80. The record reflects that the trial court denied Ford's "Motion for Judgment on the Evidence." *Id*. at 33. In the trial court's final instructions at the conclusion of the evidence, however, the claim of defective design related to handling and stability was omitted. Instead, the jury was simply told, "With regard to Ford, the product at issue is the Explorer, and specifically the sunroof and the seatbelt assembly." Tr. at 2932–33. Other instructions did not identify any claim by the plaintiff alleging defective design related to the Explorer's handling and stability characteristics. And in closing argument, the plaintiff did not assert a claim for defective design related to the Explorer's handling and stability characteristics. Because this claim ultimately was not presented to the jury and thus not a basis for its verdict, we decline to address the sufficiency of the evidence as to handling and stability.

## 2. Rule Favoring Affirmance of General Verdict

Ford contends that if this Court finds the evidence insufficient to support any one but not all of the plaintiff's theories of liability against Ford, reversal with retrial is required because Ford sought, but was denied, directed verdicts. Ford acknowledges that Indiana law "has always recognized the rule that a general verdict will be affirmed if there is any evidence to support the verdict." Ford's Appellant's Br. at 38. *Accord* PSI Energy, Inc. v. Roberts, 829 N.E.2d 943, 950 (Ind. 2005); Picadilly, Inc. v. Colvin, 519 N.E.2d 1217, 1221 (Ind. 1988); Epperly v. Johnson, 734 N.E.2d 1066, 1070 (Ind. Ct. App. 2000), *trans. not sought*; Tipmont Rural Elec. Member-

6

ship Corp. v. Fischer, 697 N.E.2d 83, 86 (Ind. Ct. App. 1998), *summarily aff'd*, 716 N.E.2d 357 (Ind. 1999). Citing an earlier line of cases decided when Indiana procedure was governed by "code pleading," however, Ford urges that if it is determined on appeal that one of a plaintiff's theories should have been dismissed but was instead presented to the jury, appellate courts must "presume the general verdict was based on the bad theory . . . unless it affirmatively appears that the verdict rests upon the [good theory]." Ford's Appellant's Br. at 39–40 (internal quotation marks omitted).

We decline to consider altering Indiana's rule favoring affirmance of a general verdict. Ford's appeal does not challenge the denial of its motions for judgment on the evidence. And more significantly, the jury verdicts on each of the two theories presented to the jury, seatbelt system defective design and sunroof defective design, are each supported by sufficient evidence, and thus Ford's request to modify the rule is immaterial.

### 3. Exclusion of Medical Causation Testimony

Ford contends that the trial court erroneously excluded the testimony of Catherine Corrigan, a biomedical engineer. Corrigan had testified on direct examination, ultimately giving her opinion that the fatal injuries to the plaintiff's decedent's head and neck likely happened at different times, could have happened inside or outside the vehicle, and that he would have been at risk of a severe injury even if not ejected from the vehicle. During her cross-examination, when it was established that she is not a medical doctor, the plaintiff successfully challenged her qualifications to testify as to the cause of injury. Following an extensive discussion with trial counsel, the court gave the following admonishment: "Ladies and gentlemen of the Jury, you may consider this witness' testimony in terms of biomechanics. You may not consider this witness' testimony in terms of medical causation of any of the injuries that the decedent may have sustained." Tr. at 1875.[3]

---

[3] During final instructions, the court also stated: "Under Indiana law, only a medical doctor is legally competent to offer an opinion as to the medical causation of physical injuries, including death." Court's Final Instruction No. 33, Tr. at 2942. Because Ford's Appellant's Brief sets out only the challenged instruction but not "the verbatim objections . . . made thereto," as required by Indiana Appellate Rule 46(A)(8)(e), we do not consider Ford as presenting an appellate challenge to this final instruction.

7

Citing Brown v. Terre Haute Regional Hosp., 537 N.E.2d 54, 61 (Ind. Ct. App. 1989), *trans. not sought*, Ford acknowledges that "[s]ubstantively, Indiana law provides that lay witnesses cannot provide testimony as to medical causation" but claims that Corrigan had a "unique blend of medical and biomechanical engineering training" that rendered her qualified to opine as to the cause of death. Ford's Appellant's Br. at 44. In addition to disputing the substance of the trial court's ruling, Ford also argues that the trial court erred in allowing the plaintiff "to make an after-the-fact challenge to Corrigan's qualifications, and then compounded that error by not conducting a Rule 702 inquiry."[4] *Id.* at 44–45.

Our requirement that evidence objections be made contemporaneously with the presentation of the evidence is for the purpose of permitting a trial court to take appropriate corrective action during the trial. Godby v. State, 736 N.E.2d 252, 255 (Ind. 2000). This purpose was served in the present case. The plaintiff's objection to Corrigan's medical causation testimony was made while the witness was still on the stand and enabled the court to take timely corrective action. Any lack of plaintiff's promptness in challenging the testimony did not operate to Ford's detriment. We also decline to find error in the absence of a formal Evidence Rule 702 inquiry, which was not requested by either party, and the substance of which was in large measure served by the extended bench colloquy with the parties following the plaintiff's objection to Corrigan's medical causation testimony.

Whether a party's proffered expert witness should be allowed to testify is a decision within the discretion of the trial court and is only reviewed on appeal for abuse of discretion. Roach v. State, 695 N.E.2d 934, 939 (Ind. 1998); Byrd v. State, 593 N.E.2d 1183, 1185 (Ind. 1992). We find no abuse of discretion in the trial court's admonishment of the jury consistent with established Indiana law.

---

But we decline to extend the requirements of this rule to Ford's challenge to the trial court's separate mid-trial jury admonition made during Corrigan's testimony.

[4] Indiana Evidence Rule 702 governs the admissibility of scientific, technical, or other specialized knowledge intended to assist the jury. "Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Ind. Evid. R. 702(b).

## 4. Denial of Motion for Mistrial

Ford also claims the trial court erred in failing to grant its motion for a mistrial. The final witness in this fourteen-day trial was TRW's witness Jeffrey L. Pearson, an engineering consultant, who expressed his opinion that the slack in the seatbelt was not caused by a failure of the seatbelt retractor mechanism but by the bending of the "slider bar" bolted horizontally to the floor of the vehicle, which allows the seatbelt assembly to move when the seat is adjusted. We understand the focus of Ford's challenge to be an incident occurring during the plaintiff's cross-examination of Pearson and reflected in the record as follows:

> Q. [plaintiff's counsel] It is part of your opinion in this case that you have stated to this Jury, and you have in your report, that the bending of this imparted some of the slack that caused Mr. Moore [plaintiff's decedent] to come out?
>
> A. [Pearson] In part, yes.
>
> Q. [plaintiff's counsel] And it kinked like that (indicating)?
>
> A. [Pearson] No, that's not right.
>
> [plaintiff's counsel] May I hand these two to the Jury, your Honor, so they can look them over?
>
> THE COURT: You may.

Tr. at 2529–30. Neither Ford nor TRW presented any objection at that time. Later, during re-direct examination, TRW revisited the issue, asking Pearson, "Now, [plaintiff's counsel] stood up here and took a bar and bent it over his knee, I think?" Tr. at 2599. When Pearson replied "Yes," further questions from TRW enabled Pearson to explain why "[b]ending this bar over your knee" is "completely different than the way in which the Moore bar was deformed." *Id.*

The first expression of displeasure to the bar-bending demonstration does not appear until twenty pages later in the transcript when counsel for Ford requested the court to "firmly instruct" the jury to "disregard the demonstration that [plaintiff's counsel] did," claiming that it was "very misleading, . . . improper, . . . highly prejudicial, and it just never should have been done." Tr. at 2620. At that point, counsel for the parties engaged in a lively dialogue, and the trial judge advised that he would consider the request and rule before the conclusion of the witness's testi-

9

mony.  The examination of Pearson then continued until the lunch recess.

Upon return after the recess, and before the court had ruled on the motion to strike, counsel for Ford further addressed the slider bar demonstration, stating that "after giving this additional thought . . . I think . . . it is so prejudicial, Judge, that even an instruction the Court could give, I don't believe can relieve the prejudice of what's happened here.  And I would move for a mistrial."  Tr. at 2644.  Noting that the demonstration was not in accordance with its grant of a motion in limine prohibiting demonstrations without prior approval, and that "I don't think this demonstration portrays an accurate representation of what occurred," the trial court granted the motion to strike, Tr. at 2648, and excluded the bent slider bar exhibit used in the demonstration.  Tr. at 2661.  Immediately upon the jury's return to the courtroom after lunch recess, the trial court admonished, "this morning there was a demonstration by [plaintiff's counsel] concerning the bending of one of those slider bars.  [The] Court's now admonishing you to disregard that demonstration, and ordering you, that you may not consider that demonstration in your deliberations in this matter."  Tr. at 2662.  Neither defendant questioned the adequacy of this admonition or reinstated any request for mistrial.  While not explicitly denied, the court's implicit denial of the motion for mistrial is established by the fact that the case proceeded through to jury deliberations.  In addition to its initial admonition, the trial court further instructed the jury before final instructions, "that you are not to consider any evidence of the plaintiff's claims with respect to the slider bar in your deliberations.  That issue has been removed from your consideration, and you are not to consider that in your deliberations."  Tr. at 2799.

The decision on a motion for mistrial lies within the discretion of the trial court.  Booher v. State, 773 N.E.2d 814, 820 (Ind. 2002); Pierce v. State, 761 N.E.2d 821, 825 (Ind. 2002).  A mistrial is an extreme remedy and required only "when no other method can rectify the situation."  Booher, 773 N.E.2d at 820.  A prompt admonishment advising the jury to disregard the improper testimony is usually enough to avoid a mistrial.  Carter v. State, 686 N.E.2d 834, 836 (Ind. 1997).  Failure to grant a mistrial may not be asserted on appeal where an admonishment is accepted without further objection or claim that it is insufficient.  Becker v. Plemmons, 598 N.E.2d 564, 568 (Ind. Ct. App. 1992), *trans. not sought*.

10

Here, the trial court gave favorable consideration to Ford's belated objection, treating it as a motion to strike, granting it, and also excluding from evidence the exhibit associated with it. In addition the court specifically admonished the jury to disregard the demonstration and issued the admonition promptly after it was requested. Ford made no objection or argument at trial that the admonition was insufficient. In addition, the jury was even further admonished on the issue before final arguments. We reject Ford's claim of mistrial error.

### 5. Denial of TRW's Motion for Judgment on the Evidence

TRW's appeal in part challenges the trial court's denial of its motion for judgment on the evidence filed after the jury verdict and entry of judgment. TRW contends that the evidence was insufficient to prove any negligence on its part. TRW argues that its evidence showed that the seatbelt assembly was manufactured according to, and fully complied with, Ford's detailed specifications, that it fully met all applicable government vehicle safety regulations, that the seatbelt assembly design was used in the vast majority of cars produced at the time, and that the plaintiff's accident scenario was reasonably unforeseeable at the time of manufacture.

Indiana Trial Rule 50 allows a party to move for a judgment on the evidence when some or all of the "issues in a case tried before a jury . . . are not supported by sufficient evidence" or the verdict is "clearly erroneous as contrary to the evidence because the evidence is insufficient to support it." Ind. Trial Rule 50(A). When reviewing a motion for judgment on the evidence, an appellate court looks at the "evidence and the reasonable inferences drawn most favorable to the non-moving party." Kirchoff v. Selby, 703 N.E.2d 644, 648 (Ind. 1998). We will reverse only when "there is no substantial evidence supporting an essential issue in the case." *Id*. Thus, to overturn a trial court's denial of a motion for judgment on the evidence and thereby take the issue from the jury, the "evidence must support without conflict only one inference which is in favor of the defendant." Ross v. Lowe, 619 N.E.2d 911, 914 (Ind. 1993).

The plaintiff's theory of liability against TRW was that it "placed into the stream of commerce a defectively designed, unreasonably dangerous product and was negligent in the design of the product," and that, as to TRW, "the product at issue is the seatbelt assembly." Court's

11

Final Instruction No. 13, Tr. at 2932. The jury was also instructed that "the plaintiff must prove that the defectively designed product proximately caused, or enhanced, the injuries that resulted." *Id.* at 2933. As presented at trial against TRW, the plaintiff's claims were thus based on an alleged design defect in the seatbelt assembly. As noted *supra*, in product liability claims alleging a product design defect, the Indiana Product Liability Act substitutes a negligence standard for strict liability and prescribes the applicable standard of care. Ind. Code § 34-20-2-2. To recover damages, a plaintiff asserting a claim of defective product design "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." *Id.*

Citing the court's final jury instructions, the plaintiff argues that she was "not required to set out a separate case of negligence," but only to show TRW's "failure to implement a feasible alternative design." Appellee's Br. against TRW at 19. To the contrary, the trial court's Final Instruction No. 15 explicitly directed, "When a plaintiff alleges a design defect in the product, the plaintiff must establish the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." Tr. at 2934. This instruction is not challenged on appeal.

On appeal, the plaintiff attempts to characterize its claim against TRW in a manner other than one alleging defective design, stating, "TRW knew of the problem of rollovers with SUVs and light trucks. It knew that pretensioners could rectify the problem of spool out in seatbelts. Yet it sold parts to Ford which it knew were inadequate." Appellee's Br. against TRW at 15. The plaintiff explains that TRW "supplied a [seatbelt] retractor it knew could cause or allow spool out in a roll over," that TRW "knew that rollovers were foreseeable for SUVs," and that Ford's installation of TRW's retractor "did not cause or contribute" to the inherent defect of the retractor produced and sold by TRW. *Id.* at 20. "In short, [TRW] knew it sold a product that was inadequate." *Id.* at 19.

But a party may not change its theory of liability on appeal. Marshall County Redi-Mix, Inc. v. Matthew, 458 N.E.2d 219, 222 (Ind. 1984). We therefore assess the sufficiency of evidence supporting the plaintiff's claim against TRW based on its contentions and evidence at trial.

12

The plaintiff's theory of liability against TRW at trial was alleged negligent design, not strict liability of TRW as the manufacturer of a defective product unreasonably dangerous to the user or consumer. Where properly presented, such strict liability extends to the manufacturer of a defective component part of a product. The Product Liability Act expressly provides that a "product liability action based on the doctrine of strict liability in tort" may be commenced or maintained against "a manufacturer of the product *or of the part of the product* alleged to be defective." Ind. Code § 34-20-2-3 (emphasis added). However, because the plaintiff's claim against TRW at trial was predicated on an alleged design defect rather than the manufacture of a defective component part, the sufficiency of evidence for this claim must be assessed in light of the Indiana Product Liability Act's requirement that, for claims based on an alleged design defect, a plaintiff must establish that the manufacturer "failed to exercise reasonable care under the circumstances in designing a product." Ind. Code § 34-20-2-2.

The plaintiff does not dispute TRW's assertion that it "merely supplied a component part according to Ford's specifications." TRW's Appellant's Br. at 30. Extensive testimony was presented at trial regarding TRW's role in building the assembly, particularly the retractor, to Ford's detailed requirements. Among the evidence were written recommendations dated April 3, 1996, in which TRW proposed to Ford the development and use of a "pretensioner application that remains locked with belt tension regardless of motion," and noting that "Europe has 95% usage of pretensioner in passenger vehicles versus 6% in North America." Plaintiff's Exhibit 199, Appellee's Addendum to Briefs at 19. We further note the single general observation of TRW's expert Pearson that "during the development of a vehicle like an Explorer," Ford and TRW "work together in [the] development process," . . . "as customer and supplier." Tr. at 2579. But we find this insufficient to establish TRW's liability for negligent design.

As to TRW, the alleged design negligence was the choice not to use a seatbelt assembly with pretensioners. But the plaintiff fails to identify any evidence showing that this choice is attributable to TRW's conduct. The evidence shows only that the seatbelt assembly was manufactured by TRW in compliance with Ford's design specifications. While there was evidence that an alternative seatbelt assembly design was feasible and available to Ford, there is no evidence

13

that TRW was authorized under its contract with Ford to substitute and supply such an alternative seatbelt design. The mere availability of an alternative seatbelt design does not establish negligent design by a defendant that lacks the authority to incorporate it into the assembled vehicle.

Considering as we must only the evidence and resulting inferences favorable to the verdict and judgment, we nevertheless conclude that such evidence is insufficient to establish that TRW, as manufacturer or seller, failed to exercise reasonable care under the circumstances in designing the seatbelt assembly involved in the incident that took the life of the plaintiff's decedent. TRW's motion for judgment on the evidence should have been granted, and we therefore vacate the judgment against TRW and the allocation of 5% fault to TRW.

TRW's appellate challenge to the denial of its motion for judgment on the evidence alleged errors in addition to the insufficiency of evidence on the issue of design negligence. Because the insufficiency of design negligence evidence is dispositive, we do not address TRW's other arguments challenging the denial of its motion for judgment on the evidence. As we observed above, however, Ford's appellant's brief adopts and incorporates certain arguments contained in TRW's appellant's brief. To the extent applicable to Ford, and not otherwise already addressed in Part 1 of this opinion, these arguments allege (a) that the court erroneously permitted the plaintiff's seatbelt expert to give speculative and scientifically unreliable testimony, (b) that TRW's "spool-out" evidence was erroneously excluded, and (c) that the jury's determination of damages was insufficiently supported and was based upon improper closing argument.

## 6. Testimony of Plaintiff's Seatbelt Expert

With respect to the plaintiff's seatbelt expert, Steven Meyer, Ford adopts TRW's argument that the trial court erroneously permitted Meyer to provide speculative testimony that was not sufficiently related to the specific facts of this case. The TRW claim on appeal is that the trial court erroneously failed to exclude the entirety of Meyer's testimony because it failed to meet the requirements of Indiana Evidence Rule 702.

14

A trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. Carter v. State, 766 N.E.2d 377, 380 (Ind. 2002); Sears Roebuck & Co. v. Manuilov, 742 N.E.2d 453, 459 (Ind. 2001). The trial court's decision is presumed correct, and the party challenging the decision has the burden of persuading us that the trial court abused its discretion. State v. Pelley, 828 N.E.2d 915, 923 (Ind. 2005). It is only those rulings on admissibility made during trial, not those made on motions in limine, that may be raised on appeal. McCarthy v. State, 749 N.E.2d 528, 537 (Ind. 2001). And trial objections to admissibility, if not made contemporaneously with the admission of the challenged evidence, do not preserve for appellate review any resulting claim of error in the ruling on such untimely objections. Raess v. Doescher, 883 N.E.2d 790, 797 (Ind. 2008); White v. State, 687 N.E.2d 178, 179 (Ind. 1997).

Before trial, TRW filed a motion in limine and supporting brief seeking to limit or exclude Meyer's testimony. The trial court's ruling on this motion is not included in the record presented on appeal, but at trial TRW's counsel described "what this court has already ruled," as "denying our motion to exclude his testimony in the entirety." Tr. at 549.

To address this issue, we consider the trial court's rulings on contemporaneous objections during trial. During Meyer's testimony at trial, TRW requested the exclusion of evidence regarding two tests or experiments that Meyer had apparently conducted and about which his testimony was anticipated. TRW sought to exclude such evidence, alleging that the experimental conditions were not substantially similar to the facts of this case. *Id*. at 562. TRW's trial objection requested only the exclusion of the tests, not the general exclusion or striking of all of Meyer's testimony. *Id.* at 549, 562–63. After considerable argument of counsel regarding Evidence Rule 702 and case law interpreting it, the trial court recessed for further research. Upon returning, the trial court announced that "with respect to the testimony of Mr. Meyer and the Motion in Limine," Meyer would be permitted to testify but that the two tests "are excluded." *Id.* at 563–64.

At a later point in Meyer's direct examination, he was asked "in what part of the rollover sequence would this belt have come unlocked so that the spoolout could occur?" *Id.* at 1395–96. Meyer answered that "[i]t can occur, and it would have occurred, during the roll, most probably

15

when there were vertically directed accelerations similar to those wheels down, slam down." *Id.* at 1396. In response to the plaintiff's counsel's request to explain by showing what he meant using "that car next to you," Meyer did so, with accompanying narrative description. Tr. at 1396. TRW objected and moved to strike, asserting "speculation." *Id.* The plaintiff's counsel then responded that his questioning was "laying the foundation," and the trial court stated it would "see what the next question is." *Id.* at 1397. The witness was then asked, "To a reasonable degree of scientific certainty, sir, can you say from the marks, the forensic marks on this belt, that that definitely happened at one of those points in this rollover?" *Id.* Meyer answered that "[t]here is no doubt that it occurred," but explained that he couldn't identify the exact point of occurrence "to a specific millisecond," and that it occurred generally when the wheels were down "where there is going to be an impact that would have a vertically biased acceleration." *Id.* at 1397–98. When the plaintiff's counsel further asked the witness "[w]ithout speculating, to a reasonable degree of scientific certainty," whether "each of these rolls have . . . [v]ertically biased impacts," Ford's counsel objected, asserting "He's leading." *Id.* at 1398. The trial court permitted the witness to answer. These objections were clearly directed only at a narrow, specific evidentiary issue and did not seek to strike all of Meyer's testimony.

At the conclusion of all the evidence in the case, TRW orally moved to strike Meyer's testimony regarding "alternate designs," "[the] alleged defect of the seatbelt assembly," and "claim defect." Tr. at 2685, 2690. As to the latter, TRW asked that the jury "be instructed to disregard it." *Id.* at 2690. After hearing argument of counsel, the trial court denied these motions. *Id.* at 2733. We decline to give separate appellate consideration to the denial of these motions because they were not made at the time of the witness's testimony and because these post-trial motions did not seek to strike the entirety of Meyer's testimony, the issue presented on appeal.

TRW (and Ford by incorporation) claims on appeal that the trial court erred in failing to exclude the entirety of Meyer's testimony, but we do not find such issue to have been raised by any contemporaneous motion or request during trial. To the extent that the trial court referenced the motion in limine during Meyer's testimony and stated that he would be permitted to testify but not as to the two challenged tests, we are not persuaded that such ruling was an abuse of the trial court's broad discretion in determining the admissibility of expert testimony under Evidence

16

Rule 702. The trial court gave extensive and thoughtful consideration to TRW's expressed objections and in fact prohibited Meyer from presenting evidence about the two tests to which TRW objected. We decline to find error on this issue.

### 7. Exclusion of TRW's Evidence Regarding "Spool-out"

Ford also adopts TRW's appellate assertion that the trial court erroneously excluded two items of evidence relating to whether a "spool-out" occurred in the seatbelt retractor during this Ford Explorer rollover ejection. One item was TRW's expert's video of rollover crash testing of a Lincoln Navigator vehicle allegedly with a similar seatbelt assembly using a test dummy that was the same size and weight as the plaintiff's decedent. TRW stresses that it offered this video only as demonstrative evidence. TRW's second claim challenges the trial court's exclusion of photographs and related testimony regarding hundreds of similar seatbelt assemblies.

The rollover video was proffered during the testimony of TRW design engineer Jeffery Pearson, who testified that the video would illustrate and clarify his testimony and serve as a useful demonstrative aid. Demonstrative evidence is ordinarily admissible if it is "sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact," but it is "subject to the balancing of probative value against the danger of unfair prejudice." Wise v. State, 719 N.E.2d 1192, 1196 (Ind. 1999). A trial court's evidentiary rulings are presumptively correct. Anderson v. State, 681 N.E.2d 703, 706 (Ind. 1997). Appellate challenges of trial court determinations regarding the relevancy of evidence are reviewed for an abuse of discretion. Marcum v. State, 725 N.E.2d 852, 862 (Ind. 2000).

In this case, after considerable argument of counsel, the trial judge excluded the video, expressing his objective of "trying to be fair and impartial to both sides" and observing that the video "doesn't meet [the standard of substantial similarity] particularly," noting issues of the distances the depicted vehicle travelled while airborne and the location of the dummies used. Tr. at 2386. TRW argues that because the video was offered merely as demonstrative evidence, not reconstructive evidence, the trial court misapplied the "substantial similarity" standard.

17

We agree that the considerations regarding admissibility of demonstrative evidence are less rigorous than those used for evidence that attempts to reenact or reconstruct an event. Nevertheless, we entrust considerable latitude to trial judges in making such determinations, which as here may have been informed and interwoven in the context of lengthy, complicated, and vigorously contested trial and pre-trial proceedings. In addition to evaluating whether the video was sufficiently explanatory or illustrative to help the jury, deciding whether to permit its use as demonstrative evidence also appropriately entailed consideration of relevancy and the balance of its probative value against the danger of unfair prejudice. In the context of this litigation, TRW and Ford have not persuaded us that the trial court abused its discretion in excluding the video.

TRW also disputes the trial court's limitations on its attempt to present testimonial and photographic evidence that Pearson had personally inspected hundreds of seatbelts similar to the one involved in the fatal rollover except that they had never been in an accident and that the belts all exhibited the same type of webbing marks as those claimed by the plaintiff's expert, Meyer, were caused in this rollover and ejection. TRW asserts that the exclusion of this evidence was clearly erroneous, prejudiced its substantial rights, and was inconsistent with substantial justice.

As to Pearson's proposed testimonial and photographic evidence comparing numerous seatbelts he had observed with the one involved in this case, the plaintiff's trial objection raised various grounds but primarily alleged the failure of the proffered evidence to comply with pre-trial discovery and disclosure requirements that had been imposed by the trial court. After hearing robust arguments regarding the nature and extent of pre-trial discovery compliance and disclosure, and after specifically reviewing the content of Pearson's pre-trial report, the trial court ruled that Pearson would be permitted to testify as to his opinion regarding the cause of the marks on the seatbelt involved in the accident and on two other exemplar seatbelts that were in evidence. *Id.* at 2346–47, 2353. Limiting the testimony, however, the trial court ruled that "references to his, to the specific testing that may have been done or his analysis of that would be excluded under the standing order of this Court." *Id.* at 2347. Also excluded was Pearson's testimony about having "seen a hundred other spools." *Id.* at 2354–55.

Our reliance upon and deference to trial courts in matters of discovery compliance is well

established.

> The trial court must be given wide discretionary latitude in discovery matters since it has the duty to promote the discovery of truth and to guide and control the proceedings and will be granted deference in assessing what constitutes substantial compliance with discovery orders.  Absent clear error and resulting prejudice, the trial court's determinations as to violations and sanctions should not be overruled.

Braswell v. State, 550 N.E.2d 1280, 1283 (Ind. 1990) (internal citations omitted).  These principles are particularly germane in the present case, which involved very contentious and protracted litigation and extensive discovery disagreements.

Neither TRW nor Ford has convinced us that the trial court's rulings limiting Pearson's testimony were clearly erroneous. We defer to the court's discretion in controlling and guiding these proceedings and decline to find error on this issue.

## 8.  Damages

Also among the appellate arguments of TRW adopted by Ford is TRW's challenge to the jury's determination that the plaintiff's estate sustained $25,000,000 in total damages, subject to adjustment for comparative fault allocations.  Punitive damages were neither sought nor awarded.  TRW disputes the admission and exclusion of various evidence related to damages and claims that the amount was unsupported and excessive.

TRW argues in part that the portion of damages presumably attributable to income loss was speculative because the employment status of the plaintiff's decedent had not been finalized at the time of his death.  The plaintiff presented evidence that Daniel Moore had been offered employment as a pilot for an investment company at a salary of $85,000 per year.  But Moore had not yet signed the job offer letter, and the new job was contingent on his passing a background check.  TRW argues that Moore's employment was speculative because other evidence raised questions about the reasons for Moore's departure from prior employment, which reasons would have detrimentally affected the background check on which Moore's employment depended.  This is a matter of weight and credibility of the evidence, which are matters within the proper province of the jury.

19

In addition, TRW argues that the trial court erroneously excluded evidence pertinent to Moore's job prospects, namely Moore's ten-year driving record; records relating to his alleged arrest for spousal battery, felony obstruction of justice, and leaving the scene of an accident, which were set for trial in February 2002; and details about the background check required for Moore's new position. TRW contends that these documents were improperly excluded as hearsay evidence when, to the contrary, they should have been admitted as public records or business records under Indiana Evidence Rules 803(8) and 803(6). While the trial court did believe these documents were hearsay, it grounded its exclusion of them principally on their speculative nature and that any probative value of the documents was "far exceeded" by their prejudicial nature. Tr. at 1158; *see also* Tr. at 1159. We decline to find error on this claim.

TRW also challenges the jury's determination of total damages, claiming that the plaintiff failed to present evidence of the present value of the lost wages or of the projected personal maintenance expenses of the decedent, thus forcing the jury to speculate. TRW points to the plaintiff's counsel's closing argument claiming lost earnings of $2,125,000 based on a claimed loss of $85,000 per year until the decedent would have been sixty-five years old.

The parties direct our attention to <u>Elmer Buchta Trucking, Inc. v. Stanley</u>, 744 N.E.2d 939 (Ind. 2001), in which this Court noted the relevance in wrongful death actions of the prospective estimated costs of personal maintenance as a proper consideration in determining the amount to compensate the deceased's beneficiaries for losses they suffer. But <u>Elmer Buchta</u> does not impose any obligation of proof upon the wrongful death plaintiff. To the contrary, we found trial court error in preventing the *defendant* from introducing evidence showing that the amount of the decedent's lost earnings would have been consumed for personal expenses throughout his life. *Id.* at 942–43. Neither TRW nor Ford claims that it was prevented from presenting evidence regarding the decedent's personal living expenses or present value of the decedent's claim for lost wages. Presentation of such evidence was an option for the defendants, not a requirement of the plaintiff.

To further support its claim that the jury damage determination was excessive, TRW ar-

gues that the determination was "more than double the highest amount requested by plaintiff's counsel, resulting in an astronomic $25,000,000 verdict." TRW's Appellant's Br. at 51. In arguing damages during closing argument, the plaintiff's counsel made three references to specific amounts, economic losses based on an annual $85,000 salary until age 65, totaling $2,125,000, Tr. at 2823; $11,300,000 for the surviving widow's mental anguish, Tr. at 2824; and one penny for each second "remaining in Dan Moore's life" as "[t]he least amount of money for the least amount of time to replace this young man's father for him." Tr. at 2918. Using the life expectancy of 37.1 years indicated in the evidence, this latter calculation yields a result of $11,699,856. Aggregating the stipulated funeral and burial expenses of $3,952.21 together with the requested economic losses, the widow's emotional damage, and the son's damages, the requested damages totaled $25,128,808—an amount that was very close to the jury's ensuing total damage determination of $25,000,000. Thus the total damages found by the jury was not twice the plaintiff's request, as alleged by the defendants. Moreover, the amount of damages is governed by the evidence, not by the amount requested. *See* Ind. Motorcycle Ass'n v. Hudson, 399 N.E.2d 775, 778–79 (Ind. Ct. App. 1980), *trans. not sought*, (amount of damages is governed by the evidence and may differ from amount sought); Utica Mut. Ins. Co. v. Ueding, 175 Ind. App. 60, 68, 370 N.E.2d 373, 378 (Ind. Ct. App. 1977), *trans. not sought*.

TRW also asserts that the jury's total damage determination was the product of passion and/or prejudice engendered by the plaintiff's counsel's inflammatory comments during closing argument. TRW argues that it made several objections during the plaintiff's closing argument, but we find only one related to the appellate claim of improper inflammatory arguments. It occurred when the plaintiff's counsel stated, "These lawsuits are about people that die from Columbus and Shelbyville. These are lawsuits that need to send messages. That's why they're brought." Tr. at 2925. In response to objections by both TRW and Ford, the trial court immediately declared, "There is no claim for punitive damages," and admonished the jury, "so to that extent you are to disregard [the plaintiff's counsel's] comments." *Id.* at 2926. Neither TRW nor Ford moved for any further admonition nor requested a mistrial claiming that the admonitions were insufficient.

The defendants do not challenge the trial court's rulings during closing arguments but ra-

ther urge that the closing arguments of plaintiff's counsel engendered jury passion and/or prejudice, resulting in an excessive determination of total damages that should be reversed or reduced. But an admonishment to the jury to disregard inappropriate statements is generally presumed to cure any error. Wright v. State, 690 N.E.2d 1098, 1111 (Ind. 1997); Chapman v. State, 556 N.E.2d 927, 929 (Ind. 1990); Barnes v. State, 435 N.E.2d 235, 238 (Ind. 1982).

Because TRW's claim of excessive damages is not exclusively based upon its assertions of impropriety in the closing arguments of plaintiff's counsel, we consider this as an independent argument.

This Court has long recognized that, because of the difficulty in assessing the loss of love and affection suffered by survivors in wrongful death actions, such determination is best left to the sound discretion of a jury. New York Cent. R.R. Co. v. Johnson, 234 Ind. 457, 463, 127 N.E.2d 603, 606 (1955).

> Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence. We cannot invade the province of the jury to decide the facts and cannot reverse unless the verdict is clearly erroneous.

Manuilov, 742 N.E.2d at 462 (quoting Annee v. State, 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971)). "A jury determination of damages is entitled to great deference when challenged on appeal." *Id.* This Court has observed on occasion that a jury's discretion in making damage award determinations is not limitless and that judicial intrusion may be warranted when the amount of damages "appear[s] to be so outrageous as to impress the court at 'first blush' with its enormity." Kimberlin v. DeLong, 637 N.E.2d 121, 129 (Ind. 1994) (quoting New York Cent. R.R. Co., 234 Ind. at 466, 127 N.E.2d at 608). *See also*, *e.g.*, FMC Corp. v. Brown, 551 N.E.2d 444, 451 (Ind. 1990) (holding judgment not excessive because "[t]he judicial reaction, 'at first blush,' to this judgment is perspicacity and not outrage"); Yater v. Mullen, 23 Ind. 562, 566 (1864) (rejecting excessive damage claim for conversion of personal property); Picquet v. M'Kay, 2 Blackf. 465, 468 (Ind. 1831) (affirming verdict of $220 in trover action for 248 ½ barrels of corn); Ritter v. Stanton, 745 N.E.2d 828, 844 (Ind. Ct. App. 2001), *trans. denied*, (affirming $55,000,000 compensatory personal injury damage verdict). As explained in Kimberlin, however, "A wrongful death verdict will be considered excessive only if it is so outrageous as to indicate passion, pre-

22

judice, or partiality rather than reasoned assessment." 637 N.E.2d at 129. *See also* FMC Corp., 551 N.E.2d at 451. And in New York Cent. R.R. Co., we concluded, "we cannot say that the amount of damages assessed by the jury was so large as to indicate that the jury in assessing the amount was motivated by prejudice, passion, partiality or corruption, or considered some improper element." 234 Ind. at 466, 127 N.E.2d at 607–08 (internal citation omitted). Similarly, in Kimberlin we noted the "so outrageous" test, but concluded by holding:

> A personal injury award is not excessive where (1) the award was not based upon jury prejudice, partiality, or corruption, (2) the jury has not misunderstood or misapplied the evidence, (3) the award was not based upon consideration of an improper element such as liability insurance, and (4) the award was within the parameters of the evidence. Under such circumstances, we will not substitute our judgment for that of the jury as to reasonable compensation for a plaintiff.

637 N.E.2d at 130 (internal citation omitted). This Court has also recently explained:

> [The reviewing] court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.

Manuilov, 742 N.E.2d at 462 (quoting with approval from Prange v. Martin, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994) (internal citations omitted), *trans. denied*); *see also* Raess, 883 N.E.2d at 795.


Under Indiana's wrongful death statute, recovery for emotional damages is allowed for spouses and dependent children. "A decedent's minor children may recover for loss of parental training and guidance as well as for the loss of their parent's care." Johnson Controls, Inc. v. Forrester, 704 N.E.2d 1082, 1084 (Ind. Ct. App. 1999), *trans. denied*. In the present case, the jury was instructed that, in deciding damages, it could consider, among other things, the "reasonable value of the loss of love, care and affection to the surviving spouse, Sally J. Moore and dependent child, Stephen" and the "reasonable value of the loss of parent[al] training and guidance to the dependent child, Stephen." Tr. at 2945. The instructions also directed:

> In determining the amount of compensation for the benefit of surviving dependent child, Stephen Moore, you are to decide the amount of pecuniary benefit that the child would reasonably have received during the child's dependency or during the decedent, Daniel A. Moore's life expectancy, whichever period you determine would have ended first.

Tr. at 2945–46. This is consistent with the Wrongful Death Act, which permits damages to be

23

recovered by the decedent's surviving children who are "dependent children." Ind. Code § 34-23-1-1.

At the time of Daniel Moore's death, his wife Sally was employed as a dental assistant, and they were the parents of one child, Stephen, age nine. Responding to TRW's claim that the damage determination was excessive, the plaintiff points out that the decedent would have earned $85,000 per year in his new position as a private pilot, that his life expectancy was 37.1 years, and that his death was devastating to his wife and son, concluding, "The jury needed nothing more to determine an equitable amount of damages." Appellee's Br. against TRW at 32.

While we must endeavor to defer to the jury's damage determination, this deference is limited when the determination clearly includes a substantial amount attributable to an improper consideration. Here, of the damages itemized in the plaintiff's closing statement, the amount sought for the decedent's son was problematic. In requesting damages "to replace this young man's father for him," the plaintiff's counsel invited the jury to calculate an award at a fixed rate for the duration of the decedent's life expectancy of 37.1 years. Tr. at 2918. Under the Wrongful Death Act and the jury instructions, however, the plaintiff was entitled to damages sustained by the decedent's son for the loss of love, care, affection, parental training, and guidance only during the son's dependency, not for the projected remainder of the decedent's life.

To be entitled to dependent child damages under the Wrongful Death Act, the evidence must establish that a surviving child had a need for and actually received support. Terry v. Stephens, 921 N.E.2d 516, 523 (Ind. Ct. App. 2010), *trans. denied*. While it may be presumed that the decedent's dependent child would have remained in such dependent status until age eighteen, to project any later period of dependency would require speculation unsupported by the evidence in this case.

In most personal injury and wrongful death cases, it would be difficult, if not impossible, to ascertain the particular component amounts that comprise a jury's opaque general verdict. But the damage determination in this case presents a rare exception. As noted above, the plaintiff's requests aggregated to $25,128,808, and the jury's total damage determination was

24

$25,000,000—a divergence of only one-half of one percent. This remarkable congruence between the jury's total damage determination and the aggregate request of the plaintiff's counsel strongly implies that the jury accepted and implemented the plaintiff's proposed damage evaluation and calculation. The plaintiff's requests for $2,125,000 for lost earnings, and $11,300,000 in damages for the surviving widow's emotional damages, plus $3,952 for funeral and burial expenses, total $13,428,952. Subtracting this amount from the jury's total damage determination of $25,000,000 leaves $11,571,048, which we estimate to be the portion of the jury's award attributable to the son's projected damages for a span of 37.1 years. Because the jury should have considered only the 8 years and 27 days between December 20, 2001, the date of the decedent's death, and January 15, 2010, the son's eighteenth birthday, we estimate the son's portion of the total damage determination should have been reduced by seventy-eight percent, or $9,025,417. We find that awarding the son's damages for a period of time after his eighteenth birthday is not supported by the evidence but resulted from improper considerations and cannot be explained on any other reasonable ground.

Upon a claim of excessive or inadequate damages, Indiana Appellate Rule 66(C) authorizes several alternatives, including ordering the entry of judgment of damages in the amount supported by the evidence, App. R. 66(C)(4); ordering a new trial or hearing subject to additur or remittitur, App. R. 66(C)(5); making any relief granted subject to conditions, App. R. 66(C)(9); and granting any other appropriate relief, App. R. 66(C)(10). Black's Law Dictionary explains "remittitur" as "[a]n order awarding a new trial, or a damages amount lower than that awarded by the jury, and requiring the plaintiff to choose between those alternatives." BLACK'S LAW DICTIONARY 1409 (9th ed. 2009).

To remedy the error in the jury's total damage determination without necessarily requiring a full representation of evidence on damages, we elect to grant a new trial subject to remittitur, wherein the plaintiff may instead accept a determination of total damages, before allocation of comparative fault, in the sum of $15,974,583, which represents a $9,025,417 reduction in the jury's finding of $25,000,000 in total damages.

25

## 9. Plaintiff's Cross-Appeal

The plaintiff contends on cross-appeal that there was insufficient evidence to support the allocation of fault to nonparty Goodyear Tire and Rubber Company. Asserting the absence of expert testimony to prove the cause of the tire failure, the plaintiff seeks reversal of the jury's allocation of fault to Goodyear and a resulting judicial reallocation of fault. The defendants dispute this claim and further assert that the issue has been waived by the plaintiff due to the failure to object to various final instructions pertaining to the nonparty defense.[5]

As to the claim of waiver, the defendants propose that an appellate claim of evidence insufficiency should be deemed forfeited when a party fails to object to jury instructions informing the jury about the elements of an issue and explaining how to proceed upon its findings. We decline to adopt and interject this prerequisite to the assertion of appellate claims of insufficient evidence.

The Indiana Comparative Fault Act declares, "The burden of proof of a nonparty defense is upon the defendant." Ind. Code § 34-51-2-15. In a product liability action, the jury considers "the fault of all persons who contributed to the physical harm, regardless of whether the person was or could have been named as a party, as long as the nonparty was alleged to have caused or contributed to cause the physical harm." Ind. Code § 34-20-8-1(b). The Product Liability Act thus uses the word "fault" to embrace a wide range of bases for responsibility, including both strict product liability and common law negligence, among others.

In resolving this appellate claim of insufficient evidence supporting the jury's allocation of partial fault to Goodyear, we will reverse if, considering only the evidence and reasonable in-

---

[5] The defendants assert that the plaintiff did not object to Final Instructions 9, 10, 40, or 41. Instruction 9 told the jury that the plaintiff "has settled her claims" against Goodyear Tire and Rubber Company, which "has been named as a nonparty." Tr. at 2931. Instruction 10 explained that "a defendant may name as a non-party a person whom he claims caused in full or in part the damages of the plaintiff." *Id.* at 2931–32. Instruction 40 was the general comparative fault instruction directing the jury to apportion fault, if any, among the plaintiff, the defendants, and the nonparty; to return a defendant's verdict if the plaintiff's fault is greater than 50 percent; to determine damages if such fault is not more than 50 percent; and then to multiply the total damages by each defendant's percentage of fault. *Id.* at 2946–47. Instruction 41 provided the jury with the various verdict forms. *Id.* at 2947–49.

ferences favorable to the judgment, we find the evidence and inferences insufficient to support an essential element of the claim. *See* discussion *supra* in Part 1, paragraph 2 of this opinion.

One of the tires involved in the rollover incident was a Goodyear tire. But the record reveals scant, if any, evidence relating to whether this tire was manufactured or sold in a defective, unreasonably dangerous condition or whether Goodyear was in some other manner negligent with respect to the tire. Neither defendant identifies any evidence presented in their case in chief that supports their nonparty defense and point only to isolated statements during the cross-examination testimony of the plaintiff's accident reconstruction expert, Bruce Enz.

Enz opined that as the Explorer was traveling approximately 60 to 70 miles an hour, a "tire event started to unfold," and "the tread ultimately came off the tire." Tr. at 298. He reported that, when the vehicle was inspected shortly after the incident, "the left front tire side wall was shredded, and it was missing the tread face around the tire." *Id.* at 188. When the plaintiff's counsel later asked him what happens when a driver loses a left front tread and the driver does nothing, Enz answered, in part, "You would lose your tread and you lose your air pressure, you basically have a flat tire." *Id.* at 221. Enz also opined that a piece of tread the police found near the scene of the fatal incident came from the Ford Explorer involved. When the plaintiff's counsel was questioning him regarding photographs of the tire marks at the scene, the following colloquy occurred:

> A. [Enz] . . . And, of course, what we're seeing also is this tire mark here, that's one of the rims that's just digging in a little bit into the ground, in the softer ground.
> Q. [plaintiff's counsel] And that tells us that tire has failed essentially, the rim can get down.
> A. [Enz] It tells us something is wrong with that tire. And . . . there are other pictures that we took of this left tire mark as it crossed the white line, and where it crossed the white line, you could actually see some of the side wall flapping, and it just was not crisp. It was definitely an indication that there was a tire problem.

*Id.* at 240–41. During Enz's cross-examination, we find the following exchanges:

> Q. [counsel for Ford] Now, you told us that the tread is off, but your assumption is that the tire, it's still inflated as it's going down the road?
> A. [Enz] There is no indication that it's running flat at that time. There is no flat tire mark up there.
> Q. [counsel for Ford] But as I understand it, Mr. Enz, you did not specifically evaluate what caused the tire to perform as it did in this crash, did you?

27

A. [Enz] That is correct.
Q. [counsel for Ford] That wasn't you job in this case?
A. [Enz] No, it was not.

*Id.* at 317.

Q. [counsel for TRW] You agree that this accident was initiated by the Goodyear tire failure?
A. [Enz] Yes, sir . . . that was the precipitating factor.
\* \* \*
Q. [counsel for TRW] Now, the tire failure you described to us, it's the type of tire failure we see when a tire has been run underinflated, correct?
A. [Enz] I mean, that can be a cause.

*Id.* at 350–51.

Q. [plaintiff's counsel] How may tread separation events have you been hired over the years, sir, to investigate and render expert opinions on how they came apart and how -- or what the vehicle did?
A. [Enz] I wouldn't have made comments on how they come apart. That would have been a tire person.
Q. [plaintiff's counsel] That's the tire guy.

Tr. at 402. Later, when cross-examining the decedent's 15-year-old son, counsel for TRW asked if there had been a past "problem with a rock in one of the tires" and whether "that tire was leaking air," and the son replied "yes" as to each inquiry. *Id.* at 1141–42.


The absence of evidence serving as a basis for allocation of comparative fault to Goodyear is also impliedly confirmed in the argument of TRW's counsel during a bench conference out of the presence of the jury immediately preceding his redirect examination of the decedent's wife. TRW's lawyer stated to the trial court:

> Mr. Enz came in and told the Court and the Jury that this is the type of tire failure you see from running an underinflated tire. We know that we find a used can of "Fix-A-Flat" in the Explorer after the accident. Plaintiffs have been very careful not to talk about what caused the tire failure. But we know, their expert has admitted, it's the type of failure caused, comes from running on an underinflated tire. We have a tire failure occurring from an underinflated tire. We have a used can of "Fix-A-Flat" in the Explorer found after the accident. It's a legitimate inference for the Jury to reach that the tire failed because it had not been properly maintained.

*Id.* at 2178. During the closing arguments of Ford and TRW, there was no reference to attribution of fault to nonparty Goodyear.

28

From the evidence, it can be reasonably inferred that the rollover event was precipitated by the failure of a Goodyear tire, but there is no evidence establishing whether it resulted from a tire defect attributable to Goodyear or from normal wear and tear, underinflation, a slow leak, a road hazard or puncture, or any other cause. There is insufficient evidence on which a product liability verdict against Goodyear could have been returned if it were a named party, and thus there is insufficient evidence to support the allocation of fault to it as a nonparty.

## 10. Fault Allocation Remedy

The jury in this case determined the relative fault of the parties and the nonparty, assigning the following fault percentages: 33% to the decedent, 31% to Ford, 31% to nonparty Goodyear, and 5% to TRW. But now, with our decision to vacate the 5% fault assigned to TRW and the 31% assigned to Goodyear, the jury's remaining fault allocations account for only 64% of the total fault contributing to cause the plaintiff's damages, leaving 36% not allocated. The appropriate appellate remedy is not dictated by existing statutory provisions or case law precedent. And as noted above, Indiana Appellate Rule 66 provides us with a broad range of options.

In seeking to fashion a remedy on appeal that is consistent with the provisions of the Indiana Comparative Fault Act, which governs proceedings at trial, we find inconsistent and opposing guidance. One provision declares, "In an action based on fault that is brought against two (2) or more defendants, the claimant is barred from recovery if the claimant's contributory fault is greater than the fault of all persons whose fault proximately contributed to the claimant's damages." Ind. Code § 34-51-2-6(b). If we were to ignore the unallocated fault resulting from our decision today and literally apply only this provision, it would appear to require a final judgment in favor of the defendant Ford, whose 31% fault allocation was exceeded by the 33% allocated to the plaintiff's decedent. On the other hand, the Act also limits an allocation of less than 100% of the fault: "The percentage of fault of parties to the action may total less than one hundred percent (100%) if the jury finds that fault contributing to cause the claimant's loss has also come from a nonparty or nonparties." Ind. Code § 34-51-2-8(b)(1). Because we have determined that fault should not have been allocated to TRW and Goodyear, the remaining jury fault allocations to the

29

remaining parties, Ford and the plaintiff's decedent, fail to meet the condition to allocate less than 100% of the fault. In addition, for a jury to return a defendant's verdict, the Act requires that "the percentage of fault of the claimant is greater than fifty percent (50%) of the total fault involved in the incident which caused the claimant's death, injury, or property damage." Ind. Code § 34-51-2-8(b)(2). This jury allocated only 33% fault to the plaintiff's decedent, and thus a defendant's verdict is inappropriate.

Comment *h* to section seven of the Restatement Third, Torts: Apportionment of Liability considers the "[j]udicial reallocation of responsibility when an assignment of responsibility is legally erroneous," and suggests that "[o]ne remedy is for the court to reallocate the nonliable person's share of comparative responsibility proportionately to the remaining persons," noting the resulting advantage of avoiding a new trial. Restatement (Third) of Torts: Apportionment of Liability § 7, cmt. h (2000). But it then adds, "Nevertheless, interests of justice may sometimes require a new trial." *Id.*

In the present case, the jury was instructed that the percentages of fault they determine for the plaintiff's decedent, Ford, TRW, and nonparty Goodyear "must total 100 percent." Tr. at 2946–47. By its verdict, the jury found that the comparative fault of the plaintiff's decedent was only 33% of the total fault contributing to cause the plaintiff's damages. The allocation of an aggregate 5% fault to TRW presumably reflects the jury's belief that such percentage related to the defective seatbelt assembly it supplied to Ford for inclusion in the completed vehicle. While reasonable to predict that, without TRW as a party, the jury would have assigned that 5% to Ford as manufacturer of the finished product, we decline to engage in such speculation as a basis to reallocate the jury's fault attribution on appeal. Even more uncertain is how the jury would have reassigned the fault it erroneously imposed on Goodyear. The Florida Supreme Court has observed:

> Since liability is inextricably bound up with the apportionment of damages under the doctrine of comparative negligence, this matter must be left to the jury. When the percentages of liability are contrary to the manifest weight of the evidence, the trial court must treat this defect as an error in the finding of liability itself. The only remedy is to order a new trial on all issues affected by the error.

Rowlands v. Signal Constr. Co., 549 So. 2d 1380, 1383 (Fla. 1989) (footnote omitted).

30

We conclude that the interests of justice require a new trial to allocate fault, and we remand for a new trial on the issues of comparative fault and its allocation between Ford and the plaintiff's decedent. If the fault of the plaintiff's decedent does not exceed that of Ford, the resulting fault allocations shall be applied to the total damages determined in this case in accordance with the principles specified in Indiana Code § 34-51-2-7(b)(4).

## Conclusion

We reverse the trial court as to (a) its judgment against defendant TRW Vehicle Safety Systems, Inc., (b) its allocation of fault to nonparty Goodyear Tire and Rubber Company, (c) the percentages of comparative fault assigned to Ford Motor Company and the plaintiff's decedent, and (d) the determination of total damages subject to fault allocation. In all other respects, the judgment of the trial court is affirmed. This cause is remanded for: (a) a new trial on the issue of allocation of fault between Ford Motor Company and the plaintiff's decedent; (b) a new trial on the issue of total damages unless the plaintiff accepts a remittitur revising the total damages subject to comparative fault allocation to $15,974,583; and (c) if the fault of the plaintiff's decedent is greater than fifty percent, judgment in favor of Ford, but if the fault of the plaintiff's decedent is not greater than fifty percent, then application of the resulting fault percentages to the total damages and judgment in favor of the plaintiff accordingly.

Shepard, C.J., and Sullivan, and Rucker, JJ., concur.