## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 20 2015, 9:56 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Charles P. Dargo | Caroline B. Briggs |
| Law Offices of Charles P. Dargo, P.C. | Lafayette, Indiana |
| Demotte, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

In re the paternity of T.M.

T.M., by next friend, Jeffrey D. Drinkski, Newton County Prosecuting Attorney and L.M.,

*Appellant-Petitioner,*

v.

D.H.,

*Appellee-Respondent.*

August 20, 2015

Court of Appeals Case No. 56A03-1409-JP-324

Appeal from the Newton Circuit Court

Trial Court Cause No. 56C01-0908-JP-25

The Honorable Jeryl F. Leach, Judge

**Pyle, Judge.**

[1] Appellant/Petitioner L.M. ("Mother") appeals the trial court's order modifying physical custody of then five-year-old T.M. to Appellee/Respondent D.H. ("Father"). On appeal, Mother claims that the

trial court committed reversible error by not striking the testimony and report of the guardian ad litem ("GAL") because of alleged bias. In addition, she argues that the trial court abused its discretion in modifying the custody order because Father did not present sufficient evidence satisfying the requirements of INDIANA CODE § 31-17-2-21. Concluding that the trial court did not abuse its discretion in denying the motion to strike or modifying custody of T.M. to Father, we affirm the trial court's order.

We affirm.

## Issues

1. Whether the trial court erred when it denied Mother's motion to strike the testimony and report of the GAL.

2. Whether the trial court abused its discretion in modifying the custody order.

## Facts

Mother and Father (collectively "the Parents") are the parents of T.M., born in April of 2009. On July 19, 2010, the trial court issued an order establishing Father's paternity. Father subsequently filed a motion seeking custody of T.M., and, on April 14, 2011, the trial court approved an agreement between the Parents establishing joint legal custody of T.M. Mother retained primary physical custody, and the agreement granted Father parenting time three weekends per month and seventeen days in the summer.

[4] In January of 2014, Mother sought treatment for T.M. through Wabash Valley Alliance ("WVA") because he was displaying "angry and emotional" behavior. (Father's Ex. 1 at 4). During an initial meeting, Mother noted that T.M.'s poor behavior had begun over a year and a half prior to seeking treatment, but T.M.'s behavior had recently worsened two months prior to beginning treatment.

[5] WVA records showed that the objective for T.M.'s treatment was to help him develop "coping" and "calming" techniques to manage his behavior and feelings. (Father's Ex. 1 at 35, 37). During the first few sessions, T.M., who was then almost five-years-old, performed well in following the directions of his case manager, Frankie Steepleton ("Steepleton"). However, he also showed an "inability to count beyond three and had difficulty with [a] preschool game." (Father's Ex. 1 at 33). In subsequent sessions over three months, T.M. continued to display angry and emotional behavior, and he would not consistently communicate his feelings.

[6] Specifically, T.M. became easily frustrated when asked to write his name while coloring, could not describe how he felt about starting kindergarten or any other feeling in general, and, according to the treatment records, used noises instead of words to communicate. In one instance, T.M. stated, "Frankenstein gets mad when he does not get what he wants and when people are at the house." (Father's Ex. 1 at 30). When participating in activities during therapy, Mother would answer questions and perform tasks for T.M. instead of allowing him to do so. Treatment notes also revealed Mother's

belief that the atmosphere in her home could be better and that she specifically needed to work "on her tone of voice (yelling), sarcasm, taking responsibility, and keeping adult conversation away from the children." (Father's Ex. 1 at 31).

[7] Father did not attend therapy sessions, but he did contact Steepleton for progress reports and suggestions on what he could work on with T.M. Father subsequently filed a motion to modify custody on May 13, 2014. The trial court appointed Mary K. Emmrich ("Emmrich") as GAL on June 23, 2014 and scheduled a hearing on the motion for August 6, 2014.

[8] Emmrich filed her report with the trial court on July 18, 2014 and recommended that T.M. be placed with Father. She made this recommendation because of instability in Mother's home and because the educational resources available to address T.M.'s behavioral issues were better in the district where Father resided.

[9] During the hearing on August 6th, Emmrich testified that she did not personally know Father, Mother, or T.M. However, she did state that she knew Father's mother-in-law. Specifically, Emmrich testified that she had attended high school with Father's mother-in-law and had worked with her on a prior case. However, Emmrich testified that she had not had any contact with the mother-in-law regarding T.M.

[10] After breaking for lunch, the hearing reconvened, and Mother moved to strike Emmrich's testimony and report, claiming that she was inherently biased as a

result of her relationship with Father's mother-in-law. Father responded that Emmrich's testimony showed that she had not had contact with the mother-in-law. The trial court found "that there [was] not a showing sufficient to strike the report or Emmrich['s] [testimony.]" (Tr. 29).

[11] The court issued an order on August 18, 2014. It concluded, "there [was] a substantial and continuing change regarding the statutory factors to be considered in cases of this type that ma[de] it in the best interest of the child that custody and parenting time should be modified." (Father's App. 39). The trial court modified custody of T.M. to Father and ordered parenting time according to the Indiana Parenting Time Guidelines for Mother. Mother now appeals. We will provide additional facts as necessary.

# Decision

[12] On appeal, Mother claims that the trial court committed reversible error by not granting her motion to strike Emmrich's testimony or report and abused its discretion by modifying the custody order. We address each of her arguments in turn.

[13] **1. Motion to Strike**

[14] The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Estate of Carter v. Szymczak*, 951 N.E.2d 1, 5 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id*.

This Court will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

[15] In order to preserve an appellate argument challenging the admission of evidence, a party must have made an objection contemporaneous with the presentation of evidence, and the failure to object will result in waiver of any alleged error. *Raess v. Doescher*, 883 N.E.2d 790, 796 (Ind. 2008), *reh'g denied*.

[16] Here, it was only after returning from the lunch break that Mother moved to strike Emmrich's testimony and report based on Indiana Rule of Evidence 616 and Trial Rule 37. Because Mother failed to make a contemporaneous objection to Emmrich's testimony and report, her challenge on appeal is waived. *See, e.g.*, *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 218 (Ind. 2010) (Supreme Court declined to give consideration to objections that were not made at the time of witness's testimony).

[17] Waiver notwithstanding, the trial court did not err in denying Mother's motion to strike Emmrich's testimony or report pursuant to Indiana Evidence Rule 616. The rule provides that, "[e]vidence that a witness has a bias, prejudice, or interest for or against any party may be used to attack the credibility of the witness." The rule should be read in conjunction with Rule 403's required balancing of probative value against the danger of unfair prejudice. *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999). "Unfair prejudice . . . looks to the capacity of the evidence to persuade by illegitimate means, or

the tendency of the evidence to suggest decision on an improper basis." *Id.* (internal citation and quotation marks omitted).

[18] Mother's argument misapprehends the purpose of Rule 616. Again, Mother believes that the trial court should have striken Emmrich's testimony and report because she was biased in favor of Father. However, a plain reading of the Rule shows that it permits the admission of evidence revealing a witness's bias; it does not require trial court's to exclude *other* evidence when bias is shown. "Indiana's court's long have recognized that once a witness's bias has been demonstrated sufficiently that the [fact-finder] is unlikely to think the witness is testifying from a sense of citizenship rather than interest or bias, the court has discretion to move the trial forward." Robert L. Miller Jr., Courtroom Handbook on Indiana Evidence 238 (Thompson Reuters 2014-2015); *See also Konopasek v. State*, 946 N.E.2d 23, 27-28 (Ind. 2011). Because the trial court permitted the parties to present evidence of Emmrich's alleged bias, Mother's assertion of error goes to the weight the trial court placed upon Emmrich's testimony and report, not its admissibility. *Id.*

[19] Concerning Emmerich's relationship with Father's mother-in-law, the following colloquy took place during the hearing:

> Mother's Counsel: Did you have knowledge of any other people involved [or] associated with the parties[] here prior to doing this report?
>
> Emmrich: Do I have knowledge of other people associated with the parties . . .
>
> Mother's Counsel: Did you know any of the people . . .

Emmrich: I did not know [T.M.] and [Mother].

Mother's Counsel: And do you know any of the people who are associated . . .

Emmrich: I know [Father's mother-in-law] and her family.

The Court: Ms. Emmrich

Emmrich: Yes

The Court: I need you to wait for the question to be finished before you start to answer.

Emmrich: Thank you, your Honor.

Mother's Counsel: Ok, so you know [Father's] wife's family?

Emmrich: Yes.

Mother's Counsel: Ok.  Prior to . . . and how do you know them?

Emmrich: I went to school with them.  High [s]chool.

Mother's Counsel: Have you had any association with them in the last couple of years?

Emmrich: I've had association with them, yes.

Mother's Counsel: I have no further questions at this point.

The Court: Cross?

Father's Counsel: Yep, I am going to be a while at this point, if that's going to be ok?

The Court: We will go for a little while.

Father's Counsel: [H]ave you ever met [Father] before this
 event?

Emmrich: Not before this matter.

Father's Counsel: And have you had any . . . you said you
went to [h]igh [s]chool [with Father's mother-in-law], was there any
close
relationship between your family and them?

Emmrich: [Father's] mother-in-law was employed at[]
Indiana Developmental Technical School.  I had
been in contact with her on a previous CASA case.

Father's Counsel: Alright, but not on this particular matter?

Emmrich: Not on this matter.

(Tr. 16-17).

[20]   The record reveals that Emmrich's "relationship" with Father's mother-in-law
is very remote.  Under Rule 616, the trial court considered the evidence
concerning Emmrich's alleged bias, but, apparently, determined that there was
no basis to discount Emmrich's testimony or her report.  We also note that
when Father's mother-in-law testified during the hearing, Mother did not
question her regarding any contact or relationship with Emmrich.  As a result,
Mother has failed to persuade us that attending high school and working on
one unrelated case with Father's mother-in-law constitutes "unfair prejudice".
In addition, Mother points to no other evidence suggesting that the trial
court's decision was affected by improper bias.  Accordingly, the trial court
properly denied Mother's motion to strike.

Mother also cites Trial Rule 37 as grounds to strike the GAL's testimony. However, Trial Rule 37 contemplates sanctions for violating a court order compelling discovery. Mother has made no showing that the GAL failed to cooperate in discovery or that she sought a court order compelling discovery. Accordingly, Trial Rule 37 is inapplicable. The trial court did not abuse its discretion in denying Mother's motion to strike.

**2. Modification of Custody Order**

Mother argues that "Father failed to introduce sufficient evidence of probative value to substantiate a change of physical custody[.]" (Mother's Br. 9). Father claims that the evidence is sufficient to support the trial court's order. We agree with Father.

"[W]e review custody modifications for [an] abuse of discretion with a 'preference for granting latitude and deference to our trial judges in family law matters.'" *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). A trial court abuses its discretion if it renders a decision that is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences to be drawn therefrom. *White v. White*, 655 N.E.2d 523, 531 (Ind. Ct. App. 1995). In determining whether a trial court has abused its discretion, we will not reweigh the evidence nor reassess witness credibility, and we consider only the evidence that supports the trial court's decision. *Bowman v. Bowman*, 686 N.E.2d 921, 925 (Ind. Ct. App. 1997).

INDIANA CODE § 31-14-13-6 governs the modification of child custody in paternity proceedings. It provides that a "court may not modify a child custody order unless: (1) modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [INDIANA CODE § 31-14-13-2]." In turn, INDIANA CODE § 31-14-13-2 provides:

The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

[27] Here, the facts and circumstances before the trial court were that T.M., at almost the age of five, could not count past three and displayed behavioral problems that, according to the WVA documents, did not substantially improve during the time he was in therapy. The WVA documents also showed Mother's acknowledgement that she was not fostering a positive environment for T.M.

[28] The record also depicts drug use and domestic violence issues between Mother and her husband ("Stepfather") that led to intervention by the Department of Child Services ("DCS"). Indeed, during a traffic investigation, Stepfather told sheriff's deputies that he had spent the day looking for heroin and that Mother had sold T.M.'s Adderall. Mother, after arriving at the scene of the investigation, told deputies that Stepfather was a drug dealer.

[29] Stepfather was also arrested for battering Mother in the presence of their infant child, T.M.'s half-brother. These incidents led to DCS implementing a safety plan requiring Mother and Stepfather to refrain from using illegal drugs or excessive alcohol, to properly administer T.M.'s prescription medication, and to refrain from acts of domestic violence.[1]

[30] In contrast, Father testified that during his parenting time, T.M. did not exhibit the behavior previously mentioned. Father's wife, however, did state that T.M. would mention when Mother was having problems with her

---

[1] Prior to this safety plan, DCS had initiated another safety plan for Mother and Stepfather that only addressed domestic violence between them.

husband. Father's wife observed that T.M. appeared to be more "moody, crabby, [and] stressed out" when Mother and her husband were having issues. (Tr. 39). Further, Emmrich noted in her report that Father and his wife, unlike Mother and Stepfather, did not appear to have as much conflict in their relationship.

[31] The reasonable inference from the facts and circumstances is that the trial court considered the mental health of T.M., his interactions with the Parents, and his adjustment to Mother's home versus Father's, and determined that there was a substantial change warranting modification of the custody order. Given the evidence and the deference that we show to the trial court in family law matters, we cannot say that an abuse of discretion occurred.

[32] Affirmed.

Crone, J., and Brown, J., concur.