

I N  T H E

# Court of Appeals of Indiana

City of Indianapolis,

*Appellant-Defendant*

v.

Jacki Alexander and The Estate of Charles Michael Alexander,

*Appellee-Plaintiff*



FILED

Apr 08 2026, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 8, 2026

Court of Appeals Case No.
25A-CT-177

Appeal from the Marion Superior Court

The Honorable Patrick J. Dietrick, Judge

Trial Court Cause No.
49D12-2110-CT-35618

**Opinion by Judge Pyle**
Judges Vaidik and Mathias concur.

**Pyle, Judge.**

## Statement of the Case

The City of Indianapolis ("the City") appeals the judgment entered following a jury verdict in favor of Jacki Alexander ("Jacki") and the Estate of Charles Michael Alexander ("Charles") (collectively, "the Alexanders") and against the City. The City argues that the judgment against it should be reversed because the trial court erred by denying the City's Trial Rule 50 motion for directed verdict. However, the City presented evidence on its own behalf after the trial court's denial of its directed verdict motion and has, therefore, waived its challenge to the trial court's directed verdict ruling. *See Delagrange v. State*, 5 N.E.3d 354, 356 n.1 (Ind. 2014) (explaining that a defendant "waive[s] his right to appeal" the denial of a motion for directed verdict "by presenting evidence after the trial court denie[s] [the] motion"). Therefore, we will treat the City's appellate challenge to the jury's verdict in favor of the Alexanders and against the City as a challenge to the sufficiency of the evidence. *See id.* at 356 n.1 (explaining that any challenge to denial of directed verdict would be waived and addressing the challenge as one regarding the sufficiency of the evidence). Concluding that there was sufficient evidence to support the jury's verdict in favor of the Alexanders and against the City, we affirm the judgment against the City.

[2]     We affirm.[1]

## Issue

> Whether there was sufficient evidence to support the jury's verdict in favor of the Alexanders and against the City.

## Facts

[3]     This negligence case stems from a high-speed police pursuit that was commenced by Indianapolis Metropolitan Police Department ("IMPD"), lasted fourteen minutes, spanned two counties, involved numerous law enforcement agencies and officers, and ended in the fleeing suspect running a red light and colliding with the Alexanders' vehicle, killing Charles and causing serious injuries to Jacki.

[4]     On December 30, 2019, police officers with IMPD's Indiana Crime Guns Task Force ("the IMPD surveillance team") were conducting a surveillance operation on a house in a neighborhood in the City of Lawrence ("Lawrence") in Marion County ("the neighborhood") because they believed that Dewayne Gray ("Gray"), who was wanted on a warrant for a probation violation, was in the house. IMPD had determined Gray's location based on the use of a cell

---

[1] We first pause to address an apparent misunderstanding expressed by the City in its Reply Brief. Specifically, the City asserted that the Alexanders improperly cited to Transcript Volumes 7 and 8, alleging that these volumes are "non-existent[.]" (City's Reply Br. 5). The record before us contains six transcript volumes and three exhibit volumes. The court reporter labeled and numbered the transcript volumes as Transcript Volumes 1-6 and the exhibit volumes as Exhibit Volumes 7-9. Therefore, we understand that when the Alexanders cited to Transcript Volumes 7 and 8, they were referring to the corresponding exhibit volumes with those numbers. For this opinion, we will cite to the exhibit volumes as "Ex. Vol. 7," "Ex. Vol. 8," or "Ex. Vol. 9."

phone ping. The IMPD surveillance team, which included uniformed officers and non-uniformed or undercover officers, had received identifying information about Gray, including his photograph. Gray had tattoos on his face, neck, and left hand.

[5] The IMPD surveillance team communicated via a covert radio channel ("the covert channel"), and the audio from the covert channel was not recorded. They were also able to communicate with dispatch and other IMPD officers via IMPD's primary radio channel ("the primary channel"), which was recorded. On that day, IMPD and Lawrence Police Department ("LPD") were patched or connected to the same primary channel. A police dispatcher took any information broadcast from the primary channel and entered it into a CAD report. A CAD report "is generated whenever an event is created" during which a dispatcher takes an officer's reported information, "types into a CAD that is then either put on the screen or transmitted to an officer's computer, where they can look, read the information such as the date, time, location, type of report, and any notes that the dispatcher includes in it from the person reporting." (Tr. Vol. 3 at 35).

[6] For the IMPD surveillance operation that day, Captain Mike Bruin ("Captain Bruin") was the on-scene commander or supervisor, and Detective Christopher Smilko ("Detective Smilko") was the case agent. Around 12:49 p.m., a male exited the house and got into a Dodge Challenger ("the Challenger") that had tinted windows. The male was wearing a hood that apparently obscured his face. A member of the IMPD surveillance team announced on the covert

channel that a male "matching the description" of their target, Gray, had gotten into the Challenger and was leaving the neighborhood. (Tr. Vol. 3 at 50). The male driving the Challenger was not Gray and was instead Marcel Carter ("Carter").

[7] Undercover IMPD Detective David Williams ("Detective Williams") followed the Challenger to watch for traffic infractions so that uniformed members of the IMPD surveillance team, Detective William Wogan ("Detective Wogan"), Detective Sergio DeLeon ("Detective DeLeon"), and Detective Smilko (collectively, "the IMPD pursuit vehicles"), could conduct a traffic stop on the Challenger. The IMPD pursuit vehicles were white Ford Tauruses marked as police vehicles with lights and sirens. Detective Wogan, who knew Gray's appearance from previous interactions, drove one of the vehicles. Detective Smilko drove the other with Detective DeLeon as a passenger. On that day, the IMPD surveillance team and the IMPD pursuit vehicles did not have bodycams or dashcams.

[8] After Detective Williams saw the Challenger commit the traffic infractions of changing lanes without signaling and making a left turn without a signal, the IMPD pursuit vehicles initiated a traffic stop of the Challenger around 12:50 p.m. The details of the traffic stop varied during trial. Specifically, Carter testified that the three detectives had their guns drawn as they approached the Challenger and that he had rolled down his window and had stuck his upper body out where Detective Wogan was able to see him. On the other hand, Detective Wogan testified that his gun had not been drawn and that the driver

of the Challenger had just cracked his window to the point that Detective Wogan had only been able to see the driver's hand nearest the window. Ultimately, after the three detectives had approached the Challenger, the driver fled the scene.

[9] The IMPD pursuit vehicles then commenced a police pursuit of the Challenger. Initially, between approximately 12:51 and 12:53 p.m., the Challenger drove back to the neighborhood and the house where it had been. While in the neighborhood, Detective Wogan attempted a precision intervention technique ("PIT") maneuver, trying to stop the Challenger. Detective Wogan's PIT maneuver was unsuccessful. The Challenger drove away from the neighborhood and, thereafter, traveled northbound on Carroll Road, which is the dividing line between Marion County and Hancock County. On the primary channel, Detective Wogan repeatedly told the undercover officers in the neighborhood that he had seen other people in the neighborhood to which the undercover officers should pay attention.

[10] At that time, Gray, the target of the surveillance, was indeed in the neighborhood where members of the IMPD surveillance team remained. Gray was standing at the end of a driveway while Captain Bruin and LPD Sergeant Jeffrey Gray ("Sergeant Gray") were apprehending and handcuffing another individual ("the individual") on a driveway. Captain Bruin asked the individual if his name was DeWayne. When the individual replied that it was not, Captain Bruin asked for his name. At that point, Gray walked away.

[11]  Meanwhile, around 12:55 p.m., the Challenger headed eastbound on Pendleton Pike,[2] towards McCordsville and Fortville in Hancock County, and accelerated to ninety miles per hour. At that time, IMPD dispatch broadcast a message to law enforcement agencies, including LPD, McCordsville Police Department ("MPD"), and Fortville Police Department ("FPD"), that IMPD was in pursuit of the Challenger. The dispatcher also stated that IMPD had a felony handgun warrant for the fleeing driver. The actual fleeing driver, Carter, had no warrants. Thereafter, numerous officers from LPD, MPD, and FPD joined IMPD's pursuit of the Challenger. LPD, MPD, and FPD had operational bodycams and dashcams.

[12]  MPD and FPD operated on the same Hancock County radio channel ("the Hancock County channel"), and the Hancock County channel dispatcher informed the MPD and FPD that IMPD was requesting assistance with its pursuit of the Challenger that was heading towards McCordsville. The Hancock County channel dispatcher entered the information from the Hancock County channel into a CAD report. IMPD and LPD could not communicate directly with MPD and FPD; instead, information from these law enforcement agencies were relayed to each other via the IMPD dispatcher and the Hancock County dispatcher.

---

[2] Pendleton Pike is also known as State Road 67 and Broadway Street, depending on the location in Marion and Hancock Counties. In this opinion, we will simply refer to that thoroughfare as Pendleton Pike instead of by its alternative names.

[13] Around 12:56 p.m., the IMPD pursuit vehicles radioed that they still had a visual on the Challenger but that it was a "pretty good ways ahead[.]" (Ex. Vol. 7 at 65) (modified from upper case). Detective Wogan then radioed that he had lost the visual on the Challenger but was going to "catch back up." (Tr. Vol. 5 at 140).

[14] The Challenger, still fleeing on Pendleton Pike, eventually entered Fortville around 12:58 p.m. Around that same time, back in the neighborhood, Captain Bruin put the handcuffed individual into his unmarked police vehicle and told Sergeant Gray that he planned to talk to the individual then let him go. Captain Bruin then asked Sergeant Gray, "What's with the vehicle pursuit? Is it still going? Or do you know?" (Ex. Vol. 9, Ex. 56 at 7:13-7:15).[3]

[15] Meanwhile, multiple FPD officers followed the Challenger as it drove through Fortville. The Challenger then returned to Pendleton Pike and started driving westbound in the direction of Marion County. Three FPD vehicles followed the Challenger. FPD radioed that the Challenger was heading westbound on Pendleton Pike and noted that it and the officers were driving in excess of 100 miles per hour.

[16] The IMPD pursuit vehicles then began to follow the FPD and LPD vehicles in pursuit of the Challenger. Detective Wogan radioed, on the primary channel,

---

[3] Exhibit 56 is the bodycam video of Sergeant Gray. The primary channel communications were picked up by the bodycam microphone and can be heard in the background of the video.

that the IMPD pursuit vehicles were headed westbound on Pendleton Pike. Detective Wogan then indicated that they had caught back up and that he believed that he may be the third car and was a PIT car. Additionally, Detective Wogan again expressed his concern about the location of the target, Gray. Detective Wogan radioed, "advise the UC [undercover] cars that I am not 100% sure that it is the main target driving. I didn't get a good look before he took off so if they could hold the house. The main target might still be there." (Ex. Vol. 9, Ex. 56 at 9:27-9:36). Someone on the radio responded, "Yeah, they're clear. I think they already got eyes on him." (Ex. Vol. 9, Ex. 56 at 9:37-9:40).

[17] The speed of the Challenger and the pursuing law enforcement vehicles continued to be at least 100 miles per hour as they continued to drive westbound on Pendleton Pike in Hancock County. The dashcam video of LPD Sergeant Adam Hazelwood ("Sergeant Hazelwood"), who had parked his vehicle on the side of Pendleton Pike with his vehicle facing eastbound and showing the view of the cars driving westbound, shows that the Challenger was being pursued by six law enforcement vehicles. The last two of those vehicles were the two IMPD pursuit vehicles, which were approximately thirteen seconds and fifteen seconds behind the Challenger as it sped westbound on Pendleton Pike back towards Marion County. Along the path of westbound Pendleton Pike, the law enforcement agencies placed two sets of stop sticks, but the Challenger avoided them.

[18] Around 1:02 p.m., when the Challenger crossed the county line at Pendleton Pike's intersection with Carroll Road and reentered Marion County, FPD and MPD radioed that they had terminated their involvement in the pursuit. Detective Wogan confirmed on the radio that Hancock County had terminated their involvement. After FPD officers terminated their pursuit, they turned off their lights and sirens and slowed down. They were then passed by the two IMPD vehicles.

[19] The Challenger continued traveling at a high rate of speed on Pendleton Pike and approached the intersection at Oaklandon Road. At that time, the Alexanders were in their car on Oaklandon Road and had stopped at a traffic light at the intersection with Pendleton Pike. Charles was driving, and Jacki was in the passenger seat. When the light turned green for the Alexanders, Charles proceeded into the intersection. At the same time, which was approximately 1:03 p.m., the Challenger disregarded the red traffic signal for Pendleton Pike and struck the Alexanders' car. As a result of the collision, Charles died, and Jacki sustained serious bodily injuries, including a fractured vertebra in her neck, two broken ribs, extensive bruising, and a knee injury.

[20] At the time of this high-speed pursuit and collision at issue, IMPD had a written vehicle pursuit policy that all IMPD officers were required to follow. The policy in effect at that time was contained in IMPD General Order 4.12

("IMPD pursuit policy").[4] The IMPD pursuit policy acknowledged that "[h]igh-speed pursuits are among the most hazardous functions performed by law enforcement" and explained that "it is the policy of the [IMPD] that all officers will act in a manner that minimizes the risks associated with emergency driving and high-speed vehicular pursuits." (Ex. Vol. 7 at 43). Additionally, the IMPD pursuit policy provided that before and during any pursuit, the involved officers and supervisor were required to consider the following factors: (1) seriousness of the offense; (2) knowledge of the identity of the pursued suspect; (3) other occupants in the vehicles, especially if children; (4) weather conditions and lighting; (5) road conditions; (6) density of vehicular and pedestrian traffic; (7) locality of the pursuit; (8) familiarity with the area; (9) nature of the pursuit, including whether the pursued suspect was speeding or driving recklessly; and (10) the pursued vehicle's speed. According to the IMPD pursuit policy, the pursuing officer or a supervisor may terminate a pursuit, and such determination is to be made when considering factors similar to those considered before and during a pursuit. The supervisor and pursuing officer are "responsible for quickly weighing the [relevant] factors and determining if it is in the public interest to continue a pursuit." (Ex. Vol. 7 at 49). Supervisors are to "continually assess[] conditions" and "are responsible and accountable for ordering the termination of a pursuit, if, in their experience and judgment, the risk factors are too great to continue the pursuit." (Ex. Vol.

---

[4] This version of the IMPD pursuit policy was superseded by a new policy on August 1, 2020.

7 at 49). Once an officer is "ordered to discontinue a pursuit, [he or she] must immediately acknowledge this order via radio to both the supervisor and the communications dispatcher." (Ex. Vol. 7 at 49).

[21] In October 2021, the Alexanders filed a complaint against the City based on the alleged negligent actions of IMPD.[5] The City filed its answer and asserted various affirmative defenses, including that it was entitled to statutory immunity under the Indiana Tort Claims Act ("ITCA") and that the Alexanders' damages had been caused by a superseding or intervening act of others.

[22] Thereafter, the Alexanders and the City filed cross-motions for summary judgment on the City's affirmative defense of immunity. In relevant part, the City argued that it had law enforcement immunity under the ITCA, specifically under INDIANA CODE § 34-13-3-3(a)(8).[6] The Alexanders argued that the law enforcement immunity provision was not applicable because the IMPD officers had violated their statutory duty, under INDIANA CODE § 9-21-1-8 ("the Emergency Vehicles Statute"),[7] to drive with due regard for the safety of all

---

[5] The Alexanders also filed the complaint against the City of Lawrence, the Town of McCordsville, the Town of Fortville, and Hancock County (collectively, "the government defendants"). The government defendants settled with the Alexanders and were then dismissed from the case prior to trial.

[6] INDIANA CODE § 34-13-3-3(a)(8)(A) provides, in relevant part, that:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce . . . a law (including rules and regulations) . . . unless the act of enforcement constitutes false arrest or false imprisonment.

[7] The Emergency Vehicles Statute, INDIANA CODE § 9-21-1-8, applies to a "person who drives an authorized emergency vehicle when . . . in the pursuit of an actual or suspected violator of the law[.]" I.C. § 9-21-1-

persons and that there was a question of fact regarding whether the IMPD had continued the pursuit under circumstances where a reasonable officer who observed the dangerous activities of the fleeing suspect would have called off the high-speed chase. After holding a hearing, the trial court determined that there were "issues of disputed material fact that preclude . . . summary judgment" and denied both parties' summary judgment motions. (App. Vol. 2 at 29).

[23] The trial court held a five-day jury trial in September 2024. The crux of the Alexanders' negligence claim was that the City, by and through IMPD, acted or failed to act by negligently initiating, engaging in, continuing, and failing to terminate a police pursuit.[8] The relevant duty that was underlying their

---

8(a)(2). This statute allows the person driving an authorized emergency vehicle that is using lights and sirens to, among other things, "[p]roceed past a red or stop signal or stop sign, but only after slowing down as necessary for safe operation" and to "[e]xceed the maximum speed limits if the person who drives the vehicle does not endanger life or property." I.C. § 9-21-1-8(b). However, the statute "does not . . .[r]elieve the person who drives an authorized emergency vehicle from the *duty to drive with due regard for the safety of all persons*" and "does not . . . [p]rotect the person who drives an authorized emergency vehicle from the consequences of the person's reckless disregard for the safety of others." I.C. § 9-21-1-8(d) (emphasis added).

[8] In the trial court's preliminary instructions, it initially instructed the jury that the Alexanders' claims against the City were based on eight allegations of negligence by the IMPD. Specifically, the trial court instructed the jury that the Alexanders' negligence claims alleged that IMPD had: (1) negligently acted in its investigation, surveillance, communications, supervision and oversight during police activities on December 30, 2019; (2) negligently and recklessly operated motor vehicles during a high-speed police chase; (3) negligently executed a traffic stop, which led to the initiation and continuation of a negligent high-speed police chase; (4) negligently failed to terminate a high-speed police chase; (5) negligently relayed inaccurate information to other police agencies; (6) negligently implemented pursuit intervention techniques; (7) negligently supervised or failed to supervise a high-speed police chase; and (8) negligently failed to relay pertinent information to officers involved in a high-speed police chase. However, after the parties provided argument on the City's motion for directed verdict, the allegation of negligence was pared down to the allegation that IMPD had negligently initiated, engaged in, continued, and failed to terminate a police pursuit. That allegation of negligence was included in the final jury instructions.

negligence claim was IMPD's statutory duty under the Emergency Vehicles Statute to drive with due regard for the safety of all persons.

[24] In the trial court's preliminary instructions, it instructed the jury on the definitions of negligence, reasonable care, and responsible cause.[9] Specifically, the trial court informed the jury that a person's conduct was legally responsible for causing an injury, or the responsible cause, when the injury would not have occurred without the conduct and the injury was a natural, probable, and foreseeable result of the conduct, and it explained that there could be more than one responsible cause. Additionally, the trial court instructed the jury as follows: "When the negligence of two or more people combines to become the responsible cause of an injury or harm, then the injured person may recover damages from any or all persons causing the harm and none of those people can claim the negligence of the others as a [d]efense." (Tr. Vol. 2 at 141).

[25] Thereafter, during the City's opening statement, it argued, in part, that what had happened to Charles was "tragic" but that it was "not IMPD's fault" and was, instead "Marcel Carter's fault" because he had been "the one [who] [had]

---

[9] As our supreme court has explained:

> The new Indiana Model Civil Jury Instructions, which seek to provide guidance to juries using "plain English," recommends the avoidance of the term "proximate cause" by including the concept as part of the term "responsible cause" defined as follows: "A person's conduct is legally responsible for causing [an injury][property damage][death] if: (1) the [injury][property damage][death] would not have occurred without the conduct, and (2) the [injury][property damage][death] was a natural, probable, and foreseeable result of the conduct. This is called a 'responsible cause.'" Instruction 301, *Indiana Model Civil Jury Instructions* (2010 Edition), prepared under the auspices of the Indiana Judges Association.

*Green v. Ford Motor Co.*, 942 N.E.2d 791, 795 n.1 (Ind. 2011), *reh'g denied*.

r[u]n that red light and crashed." (Tr. Vol. 2 at 158). The Alexanders objected, and the trial court sustained the objection. The trial court noted that the City's statement was contrary to the preliminary instruction that had set "a pretty bright red line" against "pointing a finger at a non-party and arguing . . . fault" and that the City had "ventur[ed] into that area of argument during opening statements[.]" (Tr. Vol. 2 at 158-59). The trial court admonished the jury to disregard the City's statement.

[26] During the Alexanders' case-in-chief, they introduced numerous exhibits, many of which were stipulated exhibits. These exhibits included bodycam and dashcam videos, audio recordings, photographs, maps, and CAD reports from IMPD, LPD, and MPD.[10] The videos, audio recordings, and photographs depicted events, speeds, and conversations before and during the high-speed pursuit and at the crash site, and the CAD reports set forth the dispatch notes, as taken from the reporting law enforcement officers, regarding locations and speeds during the pursuit.

---

[10] We note that six stipulated exhibits from the trial have not been included in the Exhibit Volumes transmitted to our Court. Specifically, Exhibits 5, 6, 24, 51, 64, and 65 have not been included in Exhibit Volumes 7, 8, or 9. One of those exhibits was an audio recording, and the remaining exhibits were video exhibits. The table of contents in Exhibit Volume 7 indicates that Exhibits 6, 24, 51, 64, and 65 were "Not provided to court[.]" (Ex. Vol. 7 at 2-4). The table of contents does not contain a listing for Exhibit 5. A review of the transcript shows that these exhibits were played and discussed at trial. *See* Ex. 5 (Tr. Vol. 2 at 201-02); Ex. 6 (Tr. Vol. 5 at 128-43); Ex. 24 (Tr. Vol. 3 at 117-28); Ex. 51 (Tr. Vol. 4 at 69-70); Ex. 64 (Tr. Vol. 4 at 159-77); Ex. 65 (Tr. Vol. 4 at 144). Additionally, we note that the parties' briefs cite to two of these exhibits. Specifically, the Alexanders cite to Exhibit 6 in their brief, and the City cites to Exhibit 24 in its reply brief. Aside from the notation in the table of contents, we do not have any further explanation for why these exhibits have not been included in the Exhibit Volumes.

[27] Additionally, the Alexanders presented testimony from Carter and multiple law enforcement officers, including an IMPD officer who was involved in the IMPD surveillance in the neighborhood, and LPD, MPD, and FPD officers who were involved in the high-speed pursuit. The Alexanders also presented testimony from an expert witness, Dr. Andrew Scott, III ("Dr. Scott"), who had retired as a police chief after thirty years of law enforcement work, had a Ph.D. in criminal justice, had written his dissertation on police pursuits, and provided expert witness consultation on police practices and procedure.

[28] Prior to the trial in this case, Carter had been convicted of Level 3 felony resisting law enforcement (causing death) and Level 5 felony resisting law enforcement (causing serious bodily injury), and the trial court had ordered Carter to serve an aggregate sentence of twelve (12) years in the Indiana Department of Correction. Therefore, during the trial, the Alexanders presented Carter's testimony via a video of Carter's September 2024 deposition in lieu of his live testimony.[11] Carter testified that he was familiar with Gray and knew that Gray had tattoos "all over his face[.]" (App. Vol. 8 at 214).

---

[11] The court reporter did not transcribe Carter's deposition testimony into the trial transcript. However, the City, citing to Indiana Appellate Rule 27, has included the transcript of Carter's deposition testimony in its Appellant's Appendix. *See* Ind. App. R. 27 ("The Record on Appeal shall consist of the Clerk's Record and all proceedings before the trial court . . . , whether or not transcribed or transmitted to the Court on Appeal.").

The Alexanders also presented the deposition videos from two other individuals: (1) Dr. Robert Silbert ("Dr. Silbert"), whose curriculum vitae indicates that he was the Director of Physician Case Analysis; and (2) Thomas Roney ("Roney"), whose curriculum vitae indicates that he was the president of a forensic economic consulting firm. The court reporter did not transcribe the deposition video testimony for these two witnesses into the trial transcript. The City's Appellant's Appendix does not include a transcript for Dr. Silbert's or Roney's depositions.

During Carter's testimony, the Alexanders introduced photographs of Gray, which showed that Gray had tattoos on his face, neck, and left hand. Carter did not have any tattoos on his face, neck, or hands.

[29] Carter testified that, on the day of the pursuit, he had been staying at his aunt's house in the neighborhood. According to Carter, he had been wearing a hoodie when he left his aunt's house, but he then had put his hood down while he was standing in front of the Challenger and checking his lights, which took a few minutes. Carter also testified that the Challenger had a personalized license plate of CANUHANG, had factory tinted windows, and was registered in his mother's name.

[30] When IMPD conducted the traffic stop on the Challenger, Carter had a licensed gun on his passenger seat. Carter testified that he was confused why IMPD was pulling him over because he had not been speeding and that he was concerned or fearful about being a black male being pulled over. After Carter pulled the Challenger over, he looked through his rearview mirror and saw Detective Wogan waiting outside his vehicle for the IMPD detectives in the other vehicle. Carter then felt his car "shaking" and "being banged on[.]" (App. Vol. 8 at 242). According to Carter, he then rolled down his window, leaned his "head, shoulders, [and] chest[] fully out of the window[,]" and asked why they were banging on his car. (App. Vol. 8 at 242). Carter then saw Detective Wogan with his gun drawn and pointed at Carter. Carter testified that he also saw that the two other officers also had their guns in their hands. Additionally, Carter testified that when he leaned out the window, Detective

Wogan seemed "startled" when he saw Carter and "had kind of a confused look." (App. Vol. 8 at 249, 250).

[31]   Carter testified that, upon seeing that all three IMPD officers had their guns drawn and were not talking to him and realizing that he had his own gun on his passenger seat, he was "in fear for [his] life" and drove away. (App. Vol. 9 at 6). Carter stated that he then tried to return to his aunt's house in the neighborhood because he thought he would be safe there and could have a witness to what was happening. According to Carter, he slowed down in the neighborhood and was at a stop sign when an IMPD vehicle hit his car while attempting a PIT maneuver. Carter became "confused . . . why [IMPD was] trying to hit [his] car and spin [him] out of control in a neighborhood when there[] [were] people outside." (App. Vol. 9 at 9). Carter testified that the PIT maneuver "heightened" his fear and made him "even more scared[] because [IMPD] show[ed] [him] that [they were] being more aggressive and forceful" and "try[ing] to run [him] off the road." (App. Vol. 9 at 9, 10). Carter also testified that he saw some police officers in the neighborhood chasing his cousin and putting him on the ground. At that point, Carter decided to drive away from the neighborhood and back to Pendleton Pike. Carter testified that there was traffic on Pendleton Pike during the pursuit. He also testified that during the entire pursuit, he always saw police vehicles behind him and that he saw multiple law enforcement officers on the side of Pendleton Pike as he drove back to Marion County from Hancock County.

[32]    IMPD Detective Williams, who had been part of the IMPD surveillance team, testified about the various factors in the IMPD pursuit policy to be considered when deciding whether to engage in a pursuit, including the identity of the suspect and the road conditions. Detective Williams explained that if IMPD knew the identity of the suspect being chased, then it could "discontinue the pursuit and just file a warrant[.]" (Tr. Vol. 3 at 78). Additionally, he acknowledged that IMPD had already had information on where to find Gray, including the house being surveilled in the neighborhood and a cell phone ping. When discussing road conditions, Detective Williams agreed that if a pursuit occurs in a "more populated" area with busy intersections with cross traffic and traffic lights, then he would be less likely to continue a pursuit. (Tr. Vol. 3 at 81). According to the detective, "if you were faced with a bunch of different intersections and [the fleeing suspect is] running red lights, it will pose the risk of the[] [suspect] striking another vehicle or [a] vehicle striking the[] [suspect], or the pursuing officer doing the same." (Tr. Vol. 3 at 80). When the Alexanders' attorney asked Detective Williams how a fleeing driver driving recklessly would impact his decision on whether to continue a pursuit, he responded that a fleeing driver is "driving reckless for a reason and that reason is if you're pursuing them, likely because you're behind them with lights and sirens. So the thought process is if you want them to discontinue the reckless behavior, [then] you discontinue the pursuit." (Tr. Vol. 3 at 85). Additionally, the detective also explained that, pursuant to the IMPD pursuit policy, a supervisor is required to monitor any pursuit because the supervisor is "the

ultimate decision maker to continue or discontinue a pursuit" and "ultimately takes on the liability of what happens." (Tr. Vol. 3 at 76).

[33] Law enforcement officers testified that the area along Pendleton Pike, especially in Marion County, had many businesses and traffic. For example, Detective Williams testified that the area of Pendleton Pike and Oaklandon Road was a busy intersection with around twenty businesses "in the immediate area of this intersection" and that there was also a school nearby. (Tr. Vol. 3 at 56). Additionally, FPD Major Derek Shelley ("Major Shelley"), who was one of the vehicles involved in the pursuit of the Challenger as it headed westbound on Pendleton Pike back to Marion County, explained that on Pendleton Pike west of the county line at Carroll Road, there were "several businesses" and an increase in traffic "where cars are pulling out" of businesses and that that would "increase the unfortunate likelihood that an accident could occur." (Tr. Vol. 4 at 137).

[34] The Alexanders also presented that the Challenger drove in a reckless manner by speeding, running through intersections, disregarding red lights and stop signs, and swerving. Major Shelley also testified that he would not pursue a vehicle in an area with heavy traffic, especially when the vehicle had driven recklessly.

[35] Additionally, multiple officers testified that the Challenger and the pursuing vehicles were driving at speeds at or in excess of 100 miles per hour and that driving at such speeds was reckless. FPD Officer Brandon Pope ("Officer

Pope"), who was one of the vehicles involved in the pursuit of the Challenger as it headed westbound on Pendleton Pike back to Marion County, testified that when he was driving on Pendleton Pike, he had reached speeds of 125 miles per hour and up to 128 miles per hour, which was the maximum speed that his Explorer could reach. Major Shelley, who was also one of the pursuing vehicles, testified that when the Challenger got back onto westbound Pendleton Pike, it "accelerated" to an "extremely fast speed" "in excess of 100 miles per hour" and that the officers could not keep up with it. (Tr. Vol. 4 at 133, 135). MPD Sergeant Aaron Watts ("Sergeant Watts") testified that he was parked at the intersection of Pendleton Pike and Carroll Road as the Challenger and pursuing police vehicles were heading westbound on Pendleton Pike towards Marion County. Sergeant Watts used his radar and measured the Challenger's speed at 110 miles per hour. He then saw the other police vehicles, which included IMPD pursuit vehicles, still in pursuit behind the Challenger and also traveling at a high rate of speed. LPD Officer Jeremiah Carder ("Officer Carder") testified that he considered driving at speeds at 100 miles per hour to be reckless.

[36] During the trial, the Alexanders also presented testimony that FPD and MPD had terminated their involvement with the pursuit when they had reached the county line at Carroll Road and that, at that time, the IMPD pursuit vehicles were actively engaged in the pursuit and had not terminated the pursuit. Specifically, Major Shelley and Officer Pope testified that when they had dropped out of the pursuit when it reached Marion County, the two IMPD

pursuit vehicles passed them and were still in pursuit of the Challenger. Furthermore, multiple officers testified that they never heard any radio or dispatch announcement that IMPD was terminating its pursuit of the Challenger. LPD Sergeant Gray affirmed that if IMPD had terminated the pursuit, then that was something that should have been broadcast over the primary channel "so [that] all officers [would have been] aware that this pursuit ha[d] been terminated." (Tr. Vol. 4 at 198).

[37] The Alexanders also presented testimony from officers that they would have terminated the pursuit. For example, Sergeant Thomas Ashcraft ("Sergeant Ashcraft"), who was an LPD shift supervisor, testified that the pursuit of the Challenger that day was IMPD's pursuit "[f]rom the beginning . . . [t]o the end." (Tr. Vol. 5 at 45). Sergeant Ashcraft also testified that he "would have stopped the pursuit" because of the involved "[s]peed, erratic driving, [and] safety" issues and that he would not have allowed the officers to continue the pursuit of the Challenger in such a manner. (Tr. Vol. 5 at 18-19). LPD Officer Joshua Wise ("Officer Wise") testified that a car like the Challenger had "too much horsepower and too much speed" and that if this type of car does not stop for the police, his department would "usually terminate" a pursuit with such a car "[j]ust for safety." (Tr. Vol. 5 at 60). Officer Wise also testified that the speed involved in the pursuit concerned him and explained that he would have terminated the pursuit for "safety" reasons if it had been initiated by LPD. (Tr. Vol. 5 at 59). Moreover, Major Shelley testified that if he had the identity of the driving suspect, then he would terminate a pursuit because he could file a

warrant for the person and because he would not "want to push that suspect to where [he's] driving more recklessly that it endangers somebody's life." (Tr. Vol. 4 at 138-39).

[38] When the City cross-examined the various law enforcement officers, the City's attorney questioned them about the Emergency Vehicles Statute and their statutory duty to drive with due regard for the safety of all persons.

[39] During Dr. Scott's testimony, the Alexanders played the audio recording from the IMPD primary channel (Exhibit 6) and paused it at various points to question Dr. Scott about some of the IMPD officers' reports to dispatch heard on the audio recording. After listening to the audio recording, Dr. Scott testified that the content contained therein would have suggested to the other law enforcement agencies that Detective Wogan and IMPD did not know if they were chasing the intended target (Gray). Additionally, Dr. Scott testified that if IMPD had not been sure of the driver's identification and the pursuit was continuing in a "very high speed" and "reckless" manner, then "there should have been a hard stop on this pursuit, but there was not." (Tr. Vol. 5 at 143). Dr. Scott explained that there had been "no indication over the air that . . . this pursuit was terminated." (Tr. Vol. 5 at 143-44). Instead, according to Dr. Scott, "the evidence in this case clearly show[ed] that the pursuit terminated at the fatal conclusion and death of Mr. Alexander." (Tr. Vol. 5 at 177). Dr. Scott also opined that "[t]raveling at 100 miles an hour on streets within a city or even in a relatively rural area, [is] always dangerous." (Tr. Vol. 5 at 178).

[40] Moreover, Dr. Scott opined that IMPD "did not use reasonable care because they knew or should have known that this pursuit and the driving behavior of the driver at the time and their continued pursuit was going to leave some catastrophic event or a crash resulting in some type of injury[.]" (Tr. Vol. 5 at 166). Moreover, Dr. Scott opined that it was "very foreseeable" that a crash could occur during a high speed chase and that the IMPD's breach of duty to use reasonable care was a cause of the injuries to the Alexanders. (Tr. Vol. 5 at 148). Additionally, in Dr. Scott's opinion, the crash could have been avoided if IMPD had terminated the pursuit.

[41] After the Alexanders rested their case-in chief, the City motioned for a directed verdict or judgment on the evidence. The City initially argued that it was entitled to judgment on the evidence based on immunity under INDIANA CODE § 34-13-3-3(a)(8) for any of the Alexanders' negligence claims that involved events or actions (such as the surveillance and traffic stop) up to the time the pursuit began. The trial court asked the City if it was essentially arguing that the trial court had "screwed up on the immunity summary judgment" and whether it was attempting to "take a second bite at the apple?" (Tr. Vol. 6 at 14). The City responded that it "wouldn't put it that way." (Tr. Vol. 6 at 14). The Alexanders clarified that they were not alleging individual or separate allegations of negligence for each event leading to the pursuit and that the entirety of IMPD's acts or omissions were part of what had perpetuated the pursuit.

[42]    The City also argued that there was "simply no evidence" that IMPD had negligently and recklessly operated their vehicles during the high-speed chase. (Tr. Vol. 6 at 15). The trial court pointed out that the Alexanders' expert, Dr. Scott, had testified that "the sheer speed that IMPD was traveling based on his review of . . . the CAD and the audio, was . . . reckless." (Tr. Vol. 6 at 16). The City argued that Dr. Scott's opinion was not relevant to IMPD's statutory duty. The Alexanders argued that they had presented evidence on the breach of duty beyond their expert and that they "also had other [law enforcement] agencies say they would have terminated [the pursuit] because this was unsafe." (Tr. Vol. 6 at 16). The Alexanders also pointed out that "the police officers [we]re following in hot pursuit" and driving in the same manner as the Challenger. (Tr. Vol. 6 at 16). Additionally, the Alexanders argued that there was video evidence of the officers "continuing to do that towards the end of the pursuit" and that they had presented "more than sufficient evidence to demonstrate that there were reckless behaviors all the way around." (Tr. Vol. 6 at 16-17).

[43]    The City also argued that there was no evidence to support that IMPD had negligently failed to terminate the pursuit because the Emergency Vehicle Statute did not specify or set out a specific duty on when to terminate a pursuit and that law enforcement immunity should apply. The City asserted that there was no evidence that if IMPD had radioed that it was terminating the pursuit, then Carter would have stopped fleeing. The trial court disagreed and pointed out that Dr. Scott had testified that terminating the pursuit could lead to Carter

no longer fleeing. The City also argued that there was "no reason to believe" that Carter would have stopped fleeing, especially because the FPD vehicles were the closest vehicles to Carter before he crashed into the Alexanders. (Tr. Vol. 6 at 19). The trial court responded that that was a question for the jury to determine. The Alexanders argued that there was evidence that this was IMPD's pursuit, that only IMPD had the ability to terminate the pursuit, and that the other officers who were assisting IMPD had testified that they "would have terminated if [IMPD] had told [them] to terminate." (Tr. Vol. 6 at 19). Additionally, the Alexanders asserted that this was all a question of fact for the jury "because there[] [had] been conflicting testimony about what IMPD was actually doing at the time." (Tr. Vol. 6 at 19).

[44] The City also argued that there was no evidence that IMPD had failed to negligently supervise the high-speed pursuit because there was no statutory duty that defined how to supervise pursuits and that law enforcement immunity should apply. The Alexanders pointed out that the IMPD pursuit policy, which had been entered into evidence as Exhibit 7, set out requirements that a supervisor "must continue to oversee and continue to evaluate those ten different conditions in determining whether or not to continue or terminate a pursuit[.]" (Tr. Vol. 6 at 22). The Alexanders added that there was "case law that says that if there is a policy in place, a government agency is required to follow that policy" and that they had presented video evidence that Captain Bruin, IMPD's supervisor, asked "what the heck's going on in this pursuit." (Tr. Vol. 6 at 22). The trial court denied the City's directed verdict motion.

[45] Thereafter, the City presented its case-in-chief, during which their main theory of defense appeared to be that IMPD had not been negligent because IMPD had terminated the pursuit. The City presented testimony from IMPD Detective Wogan and Detective DeLeon, who were two of the three detectives in the IMPD pursuit vehicles. Detective Wogan testified that he was familiar with Gray's appearance and that he had had "several interactions with Mr. Gray over the years[.]" (Tr. Vol. 6 at 54). Detective Wogan testified that when he conducted the traffic stop on the Challenger, he could not see the driver's face but that he would have recognized Gray's face. Additionally, Detective Wogan testified that he had asked the driver to roll down the window and that the driver had rolled it down only a few inches to where he could see only one of the driver's hands before the Challenger took off. On cross-examination, both Detective Wogan and Detective DeLeon acknowledged that IMPD had never had a 100% confirmation that the identification of the driver of the Challenger was Gray. Detective Wogan testified that, nevertheless, he had treated the situation as if the driver were Gray.

[46] Detective Wogan and Detective DeLeon both testified that they had terminated the pursuit after they had lost visual of the Challenger in Fortville. According to Detective Wogan, he "couldn't pursue something [he] c[ould]n't see." (Tr. Vol. 6 at 64). However, both detectives acknowledged that they had never radioed that IMPD was terminating the pursuit. Detective Wogan testified that after they had lost sight of the Challenger, he had then "slowed down significantly" and just started driving back to Marion County. (Tr. Vol. 6 at

63). Additionally, Detective Wogan and Detective DeLeon both denied that the IMPD pursuit vehicles had reengaged in the pursuit, and they testified that the IMPD pursuit vehicles were merely driving back to Marion County along Pendleton Pike when they heard the radio announcement that the Challenger had crashed.

[47] The City also presented expert testimony from Brian Batterton ("Batterton"), who was a major from Cobb County Police department in Atlanta, opined that when the IMPD pursuit vehicles lost visual of the Challenger, "they [had] discontinued [the] pursuit because they couldn't see it." (Tr. Vol. 5 at 84). Batterton also opined that Captain Bruin had properly supervised the pursuit and had been in compliance with the IMPD pursuit policy because he had been aware of why the pursuit was happening, had notified other jurisdictions of the pursuit, and had gone to the crash site. On cross-examination, Batterton agreed that he had not reviewed Carter's video deposition or all seventeen videos (dashcam and bodycam) that showed portions of the pursuit. Instead, his opinion was based on two videos and prior depositions from IMPD officers.

[48] Lastly, the City presented testimony from IMPD Officer Eric Baker ("Officer Baker"), who, on the day of the pursuit, had just finished his IMPD shift and was driving eastbound on Pendleton Pike to his home in McCordsville when he heard on the radio that the pursuit was heading back westbound on Pendleton Pike towards Marion County. Officer Baker testified that he decided to deploy his stop sticks on the Challenger whenever it came his way on Pendleton Pike. He set out his stop sticks on Pendleton Pike just east of Mount Comfort Road

near a McCordsville sports bar, but he had been unsuccessful in his attempt to stop the Challenger and had gotten hurt when attempting to do so. On cross-examination, Officer Baker acknowledged that the rate of the speed involved in the pursuit made it likely that someone could get hurt and that the erratic driving involved would have made him less likely to continue the pursuit. He also acknowledged that, due to the speed involved, he was not surprised when he heard that the Challenger had been involved in a crash.

[49] Following the City's presentation of evidence, the parties discussed the proposed final instructions. The parties agreed that the trial court should instruct the jury on the Emergency Vehicles Statute and the statutory duty that applied to IMPD. The parties and the trial court also discussed the various caselaw, including *City of Indianapolis v. Earl*, 960 N.E.2d 868 (Ind. Ct. App. 2012), relating to that statutory duty.

[50] Thereafter, the parties made their closing arguments to the jury. The Alexanders argued that they had met their burden of showing that IMPD had been negligent when IMPD breached its statutory duty and that that failure resulted in the injuries and damages to the Alexanders. The Alexanders argued that all of IMPD's actions and inactions—from IMPD's initial misidentification of Carter as being Gray; to the manner it conducted the traffic stop; to its decision to attempt a PIT maneuver in the neighborhood instead of simply allowing the Challenger to return to the house from where it came; to the decision to conduct a high-speed pursuit of the Challenger along Pendleton Pike, especially where Gray had merely a probation violation warrant and

Detective Wogan had expressed his uncertainty of whether the driver was Gray and warned the surveillance team to monitor individuals in the neighborhood; to its failure to recognize Gray as he was standing near officers in the neighborhood during the pursuit; to its continuation of the pursuit at speeds in excess of 100 miles per hour; to its supervisory failure to monitor the pursuit; to its ultimate failure to terminate the high-speed pursuit—showed that they had failed to use reasonable care and had also violated part of the IMPD pursuit policy. The Alexanders acknowledged that there could be more than one responsible cause and told the jury that they had never contended that IMPD was the only "bad decision maker" involved in the pursuit. (Tr. Vol. 6 at 143). However, the Alexanders argued that IMPD was "the only bad decision maker in this courtroom . . . that we're asking you to make a judgment about." (Tr. Vol. 6 at 143). Additionally, the Alexanders argued that various officers' testimony, including IMPD Detective Williams and IMPD Officer Baker, showed that the pursuit resulting in a crash was a foreseeable result.

[51] During the City's closing argument, it acknowledged that IMPD had "initiated a pursuit of Marcel Carter" and that IMPD had a statutory duty to drive with due regard for the safety of all persons while doing so. (Tr. Vol. 6 at 155). The City argued that "simply driving at [a] high speed" did not equate to a lack of due regard. (Tr. Vol. 6 at 156). Additionally, the City argued that Charles' death was the fault of Carter and not IMPD. The City asserted that "all of [Carter's] actions" were "unrelated . . . from IMPD's initiation of [the] pursuit." (Tr. Vol. 6 at 157). Moreover, the City argued that IMPD did not have control

over Carter's actions and that he "could have stopped at any time." (Tr. Vol. 6 at 155).

[52] Thereafter, during the Alexanders' rebuttal closing argument, they told the jury that the City "d[id]n't get to blame [Carter]" because the trial court would instruct the jury that "there could be more than one cause and when two people come together to cause the injuries to the Alexanders, one of them doesn't get to sit there and point the finger at the other." (Tr. Vol. 6 at 163). The City objected, asserting that the Alexanders had misstated the law. The trial court responded, "It absolutely d[id] not." (Tr. Vol. 6 at 163). The trial court then conducted a sidebar discussion and told the City the following: "From day one you've been trying to put fault on Marcel Carter. I've been waiting for an objection. You got so close to me declaring a mistrial during closing argument by attempting to put fault on him" and by making argument "in contradiction to the instruction" that the trial court gave as a preliminary instruction and would be giving as a final instruction. (Tr. Vol. 6 at 163-64).

[53] The trial court instructed the jury, in part, as follows:

> Plaintiff[s] Jacki Alexander and the Estate of Charles Michael Alexander claimed that the City of Indianapolis was negligent. To recover on this claim, the Plaintiffs Jacki Alexander and the Estate of Charles Alexander must prove by the greater weight of the evidence that: (1) City of Indianapolis, by and through its agent IMPD, acted or failed to act by negligently initiating, engaging in, continuing, and failing to terminate a police pursuit; (2) the City of Indianapolis' act or failure to act was negligent; (3) the City of Indianapolis' act or failure to act was a responsible cause of Jacki Alexander and the Estate of Charles Alexander's

claimed injuries; and (4) Jacki Alexander and the Estate of Charles Alexander suffered damages as a result of the injuries.

(Tr. Vol. 6 at 167).

[54] Additionally, the trial court instructed the jury that INDIANA CODE § 9-21-1-8, the Emergency Vehicles Statute, required a person who drives an authorized emergency vehicle to drive with due regard for the safety of all persons, and the trial court read the entire statute to the jury. The trial court then instructed the jury that if it "decide[d] from the greater weight of the evidence that a person violated Indiana Code [§] 9-21-1-8 and that the violation was not excused, then [the jury] must decide that [that] person was negligent." (Tr. Vol. 6 at 175). The trial court also instructed the jury that "[a] police officer may violate his statutory duty of care towards the public when driving an emergency vehicle if he or she continues [a] pursuit under circumstances where a reasonable officer who observes the dangerous activities of a fleeing driver would have called off the chase." (Tr. Vol. 6 at 175).

[55] The trial court also instructed the jury that IMPD, "as a governmental agency, [wa]s bound to follow the rules it [had] create[d,]" which included the IMPD pursuit policy. (Tr. Vol. 6 at 173). The trial court explained that this policy did "not establish a higher duty than otherwise required by law" but that the jury could "consider the violation of any rules, guidelines, policies, and procedures contained in the manual and operating procedures, along with all of the other evidence and the Court's instructions[,] in deciding whether the City of Indianapolis was negligent." (Tr. Vol. 6 at 173-74).

[56] The jury entered a judgment in favor of the Alexanders and against the City. Specifically, the jury awarded damages totaling $1,625,000 for Jacki and $838,301 for the Estate of Charles.

[57] Thereafter, the City filed a motion to correct error, seeking to have the trial court apply the statutory cap under the ITCA to the damages for both Jacki and the Estate of Charles and seeking to set off the prior payments from the dismissed government defendants against the judgment entered against the City. The parties entered into an agreed amended judgment in which they agreed that the damages for Jacki and the Estate of Charles should each be reduced to the $700,000 statutory cap under INDIANA CODE § 34-13-3-4 and set off by the $380,000 already paid to each of them. Accordingly, the parties agreed that the damages due by the City would be $320,000 each for Jacki and the Estate of Charles, resulting in a total remaining judgment of $640,000 against the City. The trial court accepted the parties' agreement and entered judgment according to that agreed amended judgment.

[58] The City now appeals.

## Decision

[59] The City argues that the judgment against it should be reversed because it was entitled to law enforcement immunity under the ITCA and because the Alexanders did not show that IMPD had breached its statutory duty under the Emergency Vehicles Statute.

[60] "In the appellate review of a claim of insufficient evidence in a civil case, we affirm a verdict when, considering the probative evidence and reasonable inferences, a reasonable jury could have arrived at the same determination." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 208 (Ind. 2010) (internal quotation marks and citation omitted). We will not reweigh the evidence or judge witness credibility. *Id.* Additionally, we will consider only the evidence and inferences most favorable to the judgment in conducting our review. *Id.* "In a civil case in which the jury returns its verdict for the plaintiff and the trial court enters judgment on that verdict, reversal is proper only where there is no evidence or reasonable inference from that evidence on an essential element of the plaintiff's case." *Foddrill v. Crane*, 894 N.E.2d 1070, 1075 (Ind. Ct. App. 2008) (internal quotation marks and citation omitted), *trans. denied*.

[61] Here, the Alexanders filed a negligence claim against the City due to IMPD's high-speed pursuit that resulted in a crash that injured Jacki and killed Charles. To prevail on a claim of negligence, a plaintiff must show: (1) a duty owed to the plaintiff by the defendant; (2) a breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the defendant's breach of duty. *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016). *See also Shake v. State*, 272 N.E.3d 205, 208 (Ind. Ct. App. 2025).

[62] At trial, the parties did not dispute that the IMPD officers operating emergency vehicles had a statutory duty, under INDIANA CODE § 9-21-1-8, to drive with due regard for the safety of all persons. INDIANA CODE § 9-21-1-8, or the

Emergency Vehicles Statute, applies to a "person who drives an authorized emergency vehicle when . . . in the pursuit of an actual or suspected violator of the law[.]" I.C. § 9-21-1-8(a)(2). This statute allows the person driving an authorized emergency vehicle that is using lights and sirens to, among other things, "[p]roceed past a red or stop signal or stop sign, but only after slowing down as necessary for safe operation" and to "[e]xceed the maximum speed limits if the person who drives the vehicle does not endanger life or property." I.C. § 9-21-1-8(b). However, the statute "does not . . .[r]elieve the person who drives an authorized emergency vehicle from the *duty to drive with due regard for the safety of all persons*" and "does not . . . [p]rotect the person who drives an authorized emergency vehicle from the consequences of the person's reckless disregard for the safety of others." I.C. § 9-21-1-8(d) (emphasis added). "Indiana courts have a long and continuous history of recognizing negligence actions for statutory violations." *Kho v. Pennington*, 875 N.E.2d 208, 212 (Ind. 2007) (citing in part *City of Indianapolis v. Garman,* 848 N.E.2d 1087, 1088 (Ind. 2006) (violation of statutory duty requiring operation of emergency vehicles with due regard for the safety of all persons); *Patrick v. Miresso,* 848 N.E.2d 1083, 1087 (Ind. 2006) (violation of statutory duty requiring operation of emergency vehicles with due regard for the safety of all persons)).

[63] We first address the City's contention that the judgment against it should be reversed because it was entitled to law enforcement immunity under the ITCA. Specifically, the City asserts that the Alexanders failed to meet their burden to

overcome the application of law enforcement immunity. We reject the City's argument.

[64] First, the Alexanders did not have the burden to prevent the application of immunity. Indeed, it is the City, as the party seeking immunity, who had the burden of establishing immunity. *See Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 281 (Ind. 1994) ("The party seeking immunity bears the burden of establishing its conduct comes within the [ITCA]."). "Governmental entities and their employees are subject to liability for torts committed by them, unless the activity giving rise to the tort falls within one of the exceptions enumerated in the [ITCA]." *Earl*, 960 N.E.2d at 870. "Because the [ITCA] is in derogation of the common law, we construe it narrowly against the grant of immunity." *Mullin*, 639 N.E.2d at 281.

[65] Here, the City argues that it should have law enforcement immunity under the ITCA, specifically under INDIANA CODE § 34-13-3-3(8). This statutory section provides that a governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment. The City filed a motion for summary judgment, seeking the application of law enforcement immunity, and the trial court denied the motion. The City then argued law enforcement immunity during its motion for directed verdict, and the trial court again rejected that argument.

[66]     We agree with the trial court that the law enforcement immunity provision was not applicable in this case where the Alexanders' negligence claim involved the allegation that IMPD had breached its statutory duty contained in INDIANA CODE § 9-21-1-8.  Our supreme court has made clear that the law enforcement immunity provision in INDIANA CODE § 34-13-3-3(a)(8) "does not shield governmental entities and personnel from liability resulting from a breach of the statutory duty [in INDIANA CODE § 9-21-1-8(d)(1)] to operate emergency vehicles with due regard for the safety of all persons." *Patrick*, 848 N.E.2d at 1087 (internal quotation marks omitted and citations omitted).  Indeed, "a governmental unit and its police officer are not immune from liability for injuries caused by the officer's negligent operation of [a] police vehicle while pursuing a fleeing suspect." *Earl*, 960 N.E.2d at 870 (citing *Patrick*, 848 N.E.2d at 1084).

[67]     In *Earl*, an Indianapolis police officer engaged in a high speed chase with a suspect.  After the suspect drove at "an extremely high rate of speed[,]" crossed the center line into opposite lanes, and drove westbound in eastbound lanes, the officer continued the chase.  *Earl*, 960 N.E.2d at 869.  The fleeing suspect's vehicle then struck the plaintiff's vehicle, resulting in injury to the plaintiff.  The plaintiff filed a complaint against the City of Indianapolis and "alleged municipal liability based on [the officer's] decision to continue his pursuit without due regard of the safety of other drivers and pedestrians in the vicinity and in a high traffic area." *Id.* (internal quotation marks and citations omitted).  The City moved for summary judgment, arguing that it was immune from

liability under the law enforcement provision of the ITCA, INDIANA CODE § 34-13-3-3(a)(8). The trial court denied the City's summary judgment motion.

[68] On appeal, our Court affirmed the trial court's denial of the City's summary judgment motion. Our Court reviewed the caselaw relating to law enforcement immunity and an officer's statutory duty to drive with due regard for the safety of all persons, including *Patrick v. Miresso* and *City of Indianapolis v. Garman*. Relying on those cases, our Court explained the law enforcement immunity provision in INDIANA CODE § 34-13-3-3 did "not act as blanket immunity, and the issue of whether [the officer] acted 'with due regard for the safety of all persons' is one for the trier of fact to decide after taking into consideration the totality of the facts." *Earl*, 960 N.E.2d at 870. Accordingly, we affirmed the trial court's denial of the City's summary judgment motion.

[69] Similar to *Earl*, here, the Alexanders' negligence claim involved the allegation that IMPD had breached its statutory duty contained in INDIANA CODE § 9-21-1-8 and that issue was "one for the trier of fact to decide after taking into consideration the totality of the facts." *See id.* Therefore, the law enforcement immunity provision in INDIANA CODE § 34-13-3-3 did "not act as blanket immunity" shielding the City from the Alexanders' negligence claim. *See id.* Accordingly, we reject the City's argument that the judgment against it should be reversed because of law enforcement immunity.

[70] We next address the City's argument that the Alexanders did not present sufficient evidence to show that IMPD had breached its statutory duty under the Emergency Vehicles Statute. Again, we disagree.

[71] "The duty to drive with due regard for the safety of all persons must be measured in terms of due care under the circumstances." *Bailey v. L.W. Edison Charitable Found. of Grand Rapids, Inc.*, 284 N.E.2d 141, 145 (Ind. Ct. App. 1972) (citation and quotation marks omitted). "[A]n officer's operation of his vehicle during a chase may violate [the duty to drive with due regard under] Indiana Code section 9-21-1-8(d)(1) when the officer continues pursuit under circumstances where a reasonable officer, who observes the dangerous activities of the fleeing driver, would have called off the chase." *Earl*, 960 N.E.2d at 871. "[O]fficers may . . . be negligent if, in initiating or continuing the chase, they failed to weigh properly the foreseeable risks to the public safety triggered by their decision." *Smith v. Ciesielski*, 975 F. Supp. 2d 930, 945 (S.D. Ind. 2013) (citing *Earl*, 960 N.E.2d at 871).

[72] Here, the Alexanders presented witness testimony, bodycam and dashcam videos, audio recordings, photographs, maps, and CAD reports as part of its evidence to establish that IMPD had not acted with due care under the circumstances. As set forth in the facts above, the Alexanders presented detailed evidence setting out IMPD's actions that started with its misidentification of Carter as being Gray that led to a fourteen-minute high-speed pursuit along Pendleton Pike where the Challenger and police pursuit vehicles drove at excessive speeds. The Alexanders also presented evidence

that IMPD remained in the high-speed pursuit as it returned to Marion County and never terminated the pursuit. Additionally, the Alexanders presented evidence that the speeds involved in the pursuit were reckless and dangerous, and they presented testimony from various officers who testified that, given the speeds and circumstances involved, they would have terminated the pursuit. For example, Sergeant Ashcraft testified that he "would have stopped the pursuit" because of the involved "[s]peed, erratic driving, [and] safety" issues and that he would not have allowed the officers to continue the pursuit of the Challenger in such a manner. (Tr. Vol. 5 at 18-19). Moreover, there was also evidence that IMPD's supervisor was not apparently aware of what was happening with the pursuit.

[73] The trial court instructed the jury on the elements of negligence, the relevant law regarding IMPD's statutory duty, and the requirement for IMPD to follow its own pursuit policy. After hearing all the evidence and the trial court's instructions and then deliberating thereupon, the jury determined that the Alexanders had proven their negligence claim against the City. Ultimately, the City's argument challenging the Alexanders' evidence on the negligence elements is simply a request that we reweigh the evidence and judge witness credibility, which we will not do. *See TRW*, 936 N.E.2d at 208. Accordingly, we affirm the judgment against the City.

[74] Affirmed.

Vaidik, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Mathew M. Rayman
Office of Corporation Counsel
Indianapolis, Indiana


ATTORNEY FOR APPELLEE

Rachel A. East
Hocker Law, LLC
Indianapolis, Indiana